# Exhibit A

*1*

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                                    SUPERIOR COURT

Brandon-COPsync, LLC

    Plaintiff,

v.                                              Civil Action No. *2015 - 212*

COPsync, Inc., Ronald A. Woessner, Russell
D. Chaney, and J. Shane Rapp

    Defendants.

## VERIFIED COMPLAINT AND JURY DEMAND

### Nature of the Action

This case arises from actions by defendant COPsync, Inc. ("COPsync") designed to leave its business partner, plaintiff Brandon-COPsync, LLC ("BACS"), with no choice other than to submit to COPsync's unjustified demand that BACS agree to modify the terms of the parties' contract to allow COPsync to avoid complying with terms it no longer finds favorable. When BACS declined to renegotiate, COPsync served BACS with a notice of default and notified BACS that it was unilaterally rescinding valuable exclusivity rights BACS had under the contract. Since then, COPsync has committed further breaches of contract. This action also addresses misrepresentations made by COPsync over time as well as other wrongs.

### Parties

1.    BACS is a Massachusetts limited liability company with its principal place of business at 222 Rosewood Drive, Suite 810, Danvers, Massachusetts 01923.

2.    COPsync is a Delaware corporation with its principal place of business at 2010 FM 2673, Canyon Lake, Texas 78133.

## Jurisdiction and Venue

3.      Jurisdiction in this Court is proper pursuant to G.L. c. 212, §§ 3, 4 and G.L. c. 231A, § 1. This Court has personal jurisdiction over COPsync pursuant to G.L. c. 223A, § 3.

4.      Venue is proper pursuant to G.L. c. 223, §§ 1, 8.

## Facts

COPsync's Products

5.      COPsync manufactures three main products: the COPsync Enterprise software; COPsync 911 Threat Alert Software; and VidTac In Car Video Camera.

6.      With regard to COPsync Enterprise, COPsync's website states that it "operates the nation's largest law enforcement real-time, information sharing, communication, and data interoperability network. COPsync's mobile application enables officers to instantly access local, state, and federal law enforcement databases, efficiently gather information at the point of incident, and immediately share critical data with all officers on the COPsync network."

7.      The COPsync 911 product is a "'real-time alert system' that immediately connects the staff of a building under potential threat with the five officers closest to the building's location" through a real-time connection. This revolutionary product generates a lot of interest from schools interested in improving their security protocols.

8.      VidTac is a software driven video that is intended to replace the typical video system in many patrol cars with software that can be installed on the in-vehicle PCs.

The Parties Entered Into a Contract

9.      BACS first became aware of COPsync in June 2009 when COPsync contacted BACS.

10.     COPsync made numerous representations about its products to induce BACS to work with it. For example, and without limitation, COPsync represented that COPsync Enterprise was ready for nationwide deployment. These statements were made by Russell Chaney, COPsync's co-founder and Chairman, and Shane Rapp, COPsync's co-founder and President, to Don Flanagan, BACS's Chief Executive Officer, and others in meetings held in Boston in June 2009.

11.     Based on representations made by COPsync, BACS (in the name of Brandon Associates, LLC) entered into an Agreement for Professional Services with COPsync dated June 2, 2010 (the "Contract"). A copy of the Contract is attached hereto as Exhibit A.

12.     Under the Contract, BACS agreed to provide government relations and consulting services to COPsync, including by facilitating meetings with key officials, seeking grant funding, and pursuing government procurement opportunities.

13.     BACS also agreed to work to facilitate the sale of COPsync's products to federal, state, and local law enforcement agencies and public safety agencies in Massachusetts, Connecticut, New Hampshire, Vermont, Maine, Rhode Island, New Jersey, and federal agencies in the District of Columbia, as well as additional agencies by agreement.

14.     In addition, BACS was obligated to provide comprehensive technical support, including by providing training to all potential customers.

15.     During the life of the Contract, Rapp visited BACS in Boston approximately 8 times to educate and train BACS on COPsync products.

3

The Parties Amended Their Contract

16.    Over time, the relationship between the parties grew and changed. In a May 2012 meeting in Boston, Ronald Woessner, COPsync's Chief Executive Officer, affirmatively told Donald Flanagan, BACS's Chief Executive Officer, that COPsync did not want to, and would not, sell its products outside of Texas. Because COPsync wanted to remain a manufacturer, and not a seller, COPsync wanted to expand its relationship with BACS so that BACS would sell COPsync products nationwide.

17.    At an August 12, 2012 meeting with the Los Angeles Police Department Counter Terrorism & Special Operations Bureau, COPsync represented to both BACS as well as the potential customer that the COPsync Enterprise system works with any existing records management system, computer aided dispatch, jail, and court management software. COPsync also stated that the product works with an agency's current electronic infrastructure and that the product can exchange information among various databases. BACS later learned (around January 2013) that these statements were not true.

18.    In anticipation of continued growth, and based on COPsync's representations, the parties agreed to amend the Contract (the "First Amendment") and did so on September 30, 2012. A copy of the First Amendment is attached hereto as Exhibit B.

19.    The parties agreed in the First Amendment that BACS's "mission is to focus on National Distribution of COPsync products."

20.    Accordingly, under the Contract, as amended, BACS had the exclusive right to market, sell, and license COPsync's products and services in the same geographic regions as before (Massachusetts, Connecticut, New Hampshire, Vermont, Maine, Rhode Island, New Jersey) and to the same agencies as before, as well as in and to the following territories, agencies,

4

and partners: Los Angeles County, California; New York State; Dayton, Ohio; the Federal Bureau of Investigation; the Department of Homeland Security; Customs and Border Protection; the Secret Service; and The Raytheon Company.

21.    In addition, under the terms of the First Amendment, BACS was able to expand its exclusivity for additional territories by requesting from COPsysnc registration of exclusivity for territories where BACS had established a sales presence within reasonable proximity to the territory and BACS was able to identify to COPsync the sales resource assigned to the territory. COPsync was not to unreasonably withhold its assent to requests for such additional exclusivity. Under the terms of the First Amendment, such exclusivity was to be automatically extended as work progress was demonstrated.

22.    Similarly, BACS was able to expand its exclusivity for additional agencies, "Multi-agency Territories," and "Multi-territoral Agencies" by requesting registration of exclusivity from COPsync "once initialized via [BACS] sales contact and continuing work product." As with additional territories, COPsync was not to unreasonably withhold its assent to requests for such additional exclusivity, and such exclusivity was to be automatically extended as work progress was demonstrated.

23.    Once exclusivity was established, BACS had the exclusive right to market, sell, and license COPsync products and services in those territories and to those agencies and partners. COPsync also agreed to refer to BACS all contacts from the territories and agencies within BACS's exclusivity.

24.    BACS remained obligated to provide technical support as before.

25.     As payment for BACS's services, BACS was entitled to a commission equal to amounts actually received by COPsync in excess of $49.95 per user per month generated from any contract secured as a result of BACS's efforts.

BACS Expanded Its Business

26.     In reliance on COPsync's promises to provide BACS with exclusivity in additional territories and for additional agencies, BACS invested significantly in building up a sales and technical support infrastructure dedicated to its exclusive territories and agencies. BACS employed full-time employees in the mid-west region (based in Michigan), in the southeastern region (based in Tennessee), in the mid-atlantic region (based in New York), and other employees in Virginia and Massachusetts.

27.     In light of the growth and potential future growth of its business based on the promises of exclusivity and the representations of the products, BACS sought out investors to enable it to grow its business. To date, ten investors have invested $1,120,000 in equity in BACS. In addition, eleven investors have issued loans to BACS in the amount of $6,273,739. All of these investments were made in reliance on the understanding that BACS would have the exclusive right to sell COPsync's revolutionary products virtually nationwide. Woessner was aware of, and actively supported and participated in, BACS's efforts to increase investment in BACS so that BACS could sell COPsync products nationwide.

28.     As of December 2014, BACS had successfully secured exclusivity in 40 territories: Alabama; Arizona; California; Colorado; Connecticut; Delaware; Florida; Georgia; Idaho; Illinois; Indiana; Iowa; Kansas; Kentucky; Maine; Maryland; Massachusetts; Michigan; Minnesota; Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New York; North Carolina; North Dakota; Ohio; Oregon; Pennsylvania; Rhode Island; South Carolina; South

Dakota; Tennessee; Vermont; Virginia; Washington; West Virginia; Wisconsin; Wyoming. BACS had also registered exclusive reseller and strategic partnerships with School Safety Advocacy Council, Constellation Software, Harris Corporation, Raytheon, UNICOM (formerly "GTSi"), SecureWatch24, Patrol PC, Imperial Municipal Partners, Interstate Arms Corporation, Adamson Industries, Foundation for School Safety and Security, BeSafe Technologies, and Central Equipment Company.

29.    BACS also has a number of agreements with resellers and strategic partners, all of which rely on COPsync's performance under the Contract, as amended.

30.    BACS has been very successful in marketing COPsync's products. For example, BACS entered into an agreement with the entire state of New Hampshire for the purchase of the COPsync 911 product. Overall, BACS has sold products to 77 customers and has a number of promising potential contracts.

Problems With COPsync Products

31.    At the time the First Amendment was entered into, the WARRANTsync and VidTac products were still under development.

32.    On or around September 2012, COPsync informed BACS that the VidTac product was ready to be marketed.

33.    BACS was successful in selling many VidTac products, including to the North Haven, Connecticut Police Department. After the system was installed, however, both BACS and the North Haven Police Department discovered that the product does not work as represented by COPsync. After trying for nearly a year to resolve the camera and software issues, the North Haven Police have informed BACS that they wish to terminate their relationship with BACS.

7

34.     BACS experienced similar functionality issues with COPsync 911. For example, BACS learned in 2014 that COPsync 911 does not have the functionality to operate in the software systems used in Saugus, Massachusetts.

35.     It was only on September 29, 2014, that one of COPsync's vice-presidents finally admitted that COPsync Enterprise is available only in Texas and that it would have limited functionality in other jurisdictions.

36.     COPsync has continued to misrepresent its products to BACS. For example, the COPsync 911 product originally contained an "Officer Needs Assistance" button. BACS signed a contract with the State of New Hampshire for the purchase of the COPsync 911 product with that functionality. However, after that contract was signed and the product was deployed to New Hampshire, COPsync removed that functionality from the software platform, meaning the customer did not receive the product it purchased.

37.     These product issues have interfered with BACS' relationships with many of its customers. For example, on February 4, 2015, COPsync put the COPsync 911 system on maintenance mode for over five hours in the middle of the day during school hours, such that no alerts could be sent or received. COPsync provided no advance notice to BACS customers of the need to put the system in maintenance mode such that alternative security protocols could have been implemented.

38.     Around the same time period, a number of BACS's customers tried to use the COPsync 911 system in some fashion and discovered that the system they had purchased was unusable. BACS received numerous communications from its customers—primarily schools—complaining about this unexplained interruption in service in the middle of a school day. Actions

8

like this threaten the ability of BACS to maintain these relationships and to obtain new sales relationships.

COPsync's Additional Breaches and Unfair Acts and Practices

39.     COPsync has breached the Contract, as amended, in numerous ways, including by directly selling product into BACS's exclusive territories. For example, in October 2014, COPsync's Chief Executive Officer informed BACS that COPsync was direct marketing to the New York Police Department, Nassau County, New York, and Bergen County, New Jersey—all of which are exclusive territories or agencies of BACS.

40.     COPsync appears to have realized that BACS's efforts have created significant opportunities for the sale of COPsync products nationwide. COPsync is no longer satisfied with BACS having its exclusivity rights; COPsync wants to be able to sell its products nationwide itself.

41.     In December 2014, COPsync asked BACS if BACS would relinquish its exclusive rights to all territories and agencies outside of New England (Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont). COPsync did not offer BACS any consideration for giving up its valuable contractual rights nor did COPsync indicate that it was displeased with BACS's efforts.

42.     BACS declined to modify the Contract, as amended.

43.     Because BACS refused to acquiesce to COPsync's demand, on January 6, 2015, COPsync served BACS with a notice of default under the Contract, as amended. The alleged material breaches had no basis in fact and BACS disputes each of them. Indeed, COPsync admits that some of the alleged breaches date back to 2012, evidencing that COPsync did not consider these alleged breaches material until COPsync wished to terminate the Contract. Some of the

9

alleged breaches were also contrary to verbal agreements among the parties, further evidencing COPsync's bad faith in trying to modify the Contract.

44. COPsync also notified BACS that COPsync was unilaterally converting all of BACS's exclusive rights into non-exclusive rights (with the exception of the New England states)—in other words, exactly the result COPsync previously acknowledged it needed to negotiate with BACS. COPsync had no basis to assert such a conversion.

45. COPsync's statement that it was unilaterally terminating BACS's valuable exclusivity rights was clearly a threat designed to improve COPsync's bargaining power in renegotiating exclusivity with BACS and to force financial concessions. COPsync's conduct in disregard of known contractual arrangements and intended to secure benefits to itself is an unfair and deceptive trade practice, as are COPsync's false statements of fact.

46. In addition, while the parties were corresponding about resolution of COPsync's allegations of default, in accordance with the Contract, BACS requested that COPsync register exclusivity for the National Heritage Academies, a multi-state educational institution. Even though the Contract, as amended, was still in effect, COPsync refused to consider BACS's request "until the pending matters between [the parties] are resolved."

47. Since around mid-January 2015, COPsync also has refused to deliver products to BACS in response to valid purchase orders, which constitutes further breaches of contract and unfair and deceptive acts and practices.

10

### Count I
### (Breach of Contract—BACS v. COPsync)

48.    BACS incorporates by reference the allegations contained in paragraphs 1-47.

49.    By its actions, COPsync has materially breached the parties' Contract, by, among other things, refusing to deliver products, refusing to register additional exclusivity, and violating BACS's exclusivity.

50.    COPsync's breaches have caused BACS damages.

### Count II
### (Breach of Covenant of Good Faith and Fair Dealing—BACS v. COPsync)

51.    BACS incorporates by reference the allegations contained in paragraphs 1-50.

52.    The parties' contract includes an implied covenant of good faith and fair dealing, which imposed on COPsync a duty not to act in a way that would have the effect of destroying BACS' right to receive the fruits of the parties' contract. Among other things, and as described above, COPsync's breaches of contract and purported termination of the Contract, as amended, without grounds is destroying BACS's right to receive the fruits of the Contract, as amended.

53.    COPsync's breach of the implied covenant of good faith and fair dealing have caused BACS damages.

### Count III
### (Promissory Estoppel—BACS v. COPsync)

54.    BACS incorporates the allegations contained in paragraphs 1-53.

55.    COPsync made representations or engaged in conduct amounting to a representation intended to induce a course of conduct on the part of BACS. Among other things, COPsync (i) represented to BACS that its products were ready for nationwide use, when, in fact, they are not; and (ii) represented to BACS that COPsync did not want to become a national seller of its products.

11

56.     BACS reasonably relied on COPsync's representations to its detriment.

**Count IV**
**(Intentional Misrepresentation—BACS v. COPsync, Woessner, Chaney, and Rapp)**

57.     BACS incorporates the allegations contained in paragraphs 1-56.

58.     COPsync, Woessner, Chaney, and Rapp made material misrepresentations to BACS, including without limitation (i) a May 2012 statement made during a conference call by Woessner (located in Texas) to Flanagan (located in Danvers, Massachusetts), that COPsync did not want to, and would not, sell its products outside of Texas; (ii) the August 12, 2012 statement made during a meeting in Los Angeles by Woessner to Flanagan that the COPsync Enterprise product was ready to be deployed for nationwide use; and (iii) statements made in meetings held in Boston in June 2009 by Chaney and Rapp to Flanagan that COPsync Enterprise was ready for nationwide deployment.

59.     These material misrepresentations were made with the intention of inducing BACS to act upon them.

60.     These material misrepresentations were made with knowledge of their falsity. COPsync, Woessner, Chaney, and Rapp also knowingly failed to disclose to BACS material facts that they were under a duty to disclose.

61.     BACS justifiably relied on these material misrepresentations to its detriment.

**Count IV**
**(Negligent Misrepresentation—BACS v. COPsync, Woessner, Chaney, and Rapp)**

62.     BACS incorporates the allegations contained in paragraphs 1-61.

63.     In the course of their business transactions, COPsync made material misrepresentations to BACS, including without limitation (i) a May 2012 statement made during a conference call by Woessner (located in Texas) to Flanagan (located in Danvers,

12

Massachusetts), that COPsync did not want to, and would not, sell its products outside of Texas; and (ii) the August 12, 2012 statement made during a meeting in Los Angeles by Woessner to Flanagan that the COPsync Enterprise product was ready to be deployed for nationwide use.

64.     COPsync made these material misrepresentations with knowledge of their falsity or with reckless disregard of the actual facts. COPsync also knowingly or recklessly failed to disclose to BACS material facts that COPsync was under a duty to disclose.

65.     COPsync failed to exercise reasonable care or competence in communicating information to BACS.

66.     BACS justifiably relied on COPsync's material misrepresentations to its detriment.

## Count V
### (Interference with Advantageous Business Relations—BACS v. COPsync)

67.     BACS incorporates the allegations contained in paragraphs 1-66.

68.     BACS has business relationships or contemplated contracts of economic benefits with many potential end-users of COPsync's products. COPsync knows about these relationships.

69.     COPsync has interfered with these relationships by, among other things, failing to deliver products in a timely fashion and shutting down the COPsync 911 interface without warning and during peak user times.

70.     BACS has suffered a loss of advantage as a result of COPsync's conduct.

13

## Count VI
**(Violation of G.L. c. 93A—BACS v. COPsync, Woessner, Chaney, and Rapp)**

71.    BACS incorporates the allegations contained in paragraphs 1-72.

72.    BACS and COPsync are engaged in trade or commerce.

73.    COPsync committed unfair and deceptive trade practices by, among other things, making misrepresentations and breaching the parties' contract for purposes of improper gain. The circumstances that give rise to COPsync's unfair and deceptive acts occurred primarily and substantially in Massachusetts.

74.    COPsync's unfair and deceptive acts caused BACS damages.

## Count VII
**(Declaratory Judgment)**

75.    BACS incorporates the allegations contained in paragraphs 1-74.

76.    An actual case or controversy exists as to whether COPsync has terminated the Contract, or any part thereof, and whether COPsync has a basis in fact to terminate the Contract, or any part thereof.

77.    An actual case or controversy exists as to whether COPsync has terminated BACS's exclusive rights under the Contract, and whether COPsync has a basis in fact to terminate BACS's exclusive rights under the Contract.

78.    The controversies can be resolved, and the uncertainty removed, by the entry of a declaratory judgment.

## Requested Relief

WHEREFORE, BACS requests that the Court:

1.    award BACS damages in an amount to be determined at trial (plus interest);

2.    award BACS treble damages, attorneys' fees, and costs pursuant to G.L. c. 93A;

14

3. enter a declaratory judgment declaring that COPsync has not terminated the Contract, or any part thereof, and declaring that COPsync has no basis in fact to terminate the Contract, or any part thereof;

4. enter a declaratory judgment declaring that COPsync has not terminated BACS's exclusive rights under the Contract, and declaring that COPsync has no basis in fact to terminate BACS's exclusive rights under the Contract; and

5. award BACS any further relief that the Court deems just and proper.

**Jury Demand**

BACS demands a trial by jury on all issues so triable.

Brandon-COPsync, LLC

By its attorneys,

Cynthia M. Guizzetti (BBO# 653858)
cguizzetti@nutter.com
Joseph T. Toomey (BBO# 682675)
jtoomey@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:    (617) 439-2000
Facsimile:    (617) 310-9000

Dated:  February 12, 2015

2739093.1

15

## VERIFICATION

I, Donald Flanagan, as Chief Executive Officer of Brandon-COPsync, LLC, verify under the penalties of perjury that I have read the foregoing Verified Complaint and all the facts stated therein are true except that, as to those statements made upon information and belief, I am informed and believe they are true.

Dated: February 11, 2015

Donald Flanagan

FILED
IN THE SUPERIOR COURT
FOR THE COUNTY OF ESSEX
FEB 12 2015

CLERK

15

# Exhibit A

## AGREEMENT FOR PROFESSIONAL SERVICES
### Between Brandon Associates, LLC and COPsync, Inc.

This Agreement for Professional Services (the "Agreement") is made and entered into as of the 2nd day of June, 2010, by and between Brandon Associates, LLC, a government relations firm, having a business address of 29 Commonwealth Avenue, Boston, MA 02116 ("Brandon"), and COPsync, Inc., a public safety technology company, having an address of 210 F.M. 2673, Canyon Lake, TX 78133 ("COPsync").

## 1. TERMS OF AGREEMENT.

**A. Commencement.** This Agreement will commence on June 1, 2010.

**B. Duration.** The term of this Agreement shall be for a period twelve (12) months, ending on June 02, 2011. At the conclusion of this period, the term may be extended by the mutual agreement of both parties.

## 2. SERVICES TO BE PERFORMED.

**A. Government Relations and Consulting Services.** On behalf of COPsync, Brandon shall facilitate meetings with key state and federal officials, identify and compete for grant funding and government procurement opportunities, and identify and pursue available Requests For Responses and Requests For Proposals in the Territory (as defined below).

**B. Sales Services.** On behalf of COPsync, Brandon shall work to facilitate the sale of COPsync law enforcement products and services to local, state and federal law enforcement agencies and public safety agencies in the Territory, including presentations and demonstrations of COPsync products and services. Brandon shall also provide training to all purchasing agencies in the Territory, as well as those agencies using COPsync technology on a trial basis with the potential for purchase within the Territory. In sum, Brandon shall provide comprehensive support for all sales efforts with agencies purchasing COPsync products and services through Brandon within the Territory ("Agencies).

**C. Tech Support.** Brandon must have at least one technical engineer or support staff to handle all Tier I and Tier II support calls from Agencies 24 hrs a day 7 days a week. Brandon must have a dedicated sales force and COPsync trained Service Group staffed to provide implementation services. These implementation services will require both hardware and software installation and Brandon should provide account management to all Agencies. A staff including project managers, trainers, and data specialists will need to be available. COPsync will provide its required training to Brandon employees in order for Brandon to conduct all future comprehensive training for Brandon customers. Training will take place at the option of COPsync. Initial Training provided by COPsync outside of the Boston area will be at the expense of COPsync. COPsync shall provide all COPsync required documents. Upon completion of initial training of Brandon personal COPsync will provide required support personnel and technical advice for Brandon's first customer

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc*
*May 28, 2010*

06/02/2010  13:12   6176950551                          BRANDON ASSOCIATES                          PAGE  03/09

Brandon shall provide all future customer demonstrations without COPsync management or personnel, close opportunities without COPsync involvement, place software Purchase Order with COPsync, handle hardware on their own, work with Agencies on all grants and leasing along with providing comprehensive customer training. The parties may agree that special assistance is warranted and enter into limited additional terms on a case by case basis.

**D. Territory of Responsibility.** For purposes of this Agreement, the "Territory" means the states of Massachusetts, Connecticut, New Hampshire, Vermont, Maine, Rhode Island, New Jersey, and Federal Agencies located in the District of Columbia that Brandon initializes and closes, and such additional agencies that the parties may agree will be provided COPsync products and services who are closed by Brandon.

**E. Continuing Obligations.** In order to continue to receive full commission payments Brandon must be actively engaged in selling COPsync products and have proven the ability to meet the most challenging Agency requirements. Volume commitments will need to be met and a loyal customer base is essential. This support must have at least one Technical Engineer or support staff to handle all Tier I and Tier II support calls 24 hrs a day 7 days a week. In the event required services are not provided by Brandon and COPsync has to step in and supply the same any payments due Brandon can be reduced by the amount of the expenses incurred by COPsync to provide services to the end-users and off-set against any funds due Brandon under this Agreement

Additionally Brandon must maintain a dedicated sales force and COPsync trained Service Group staffed to provide implementation services. These implementation services will require both hardware and software installation and Brandon is expected to provide account management to all Agencies. This obligation includes providing 1st and 2nd Tier Support to Agencies. A staff including project managers, trainers, and data specialists will need to be available.

Furthermore, Brandon will provide customer demonstrations without COPsync management or staff being required to attend, close opportunities without COPsync or its management or staff involvement, place software purchase orders with COPsync, handle hardware on their own, work with Agencies on all grants and leasing, along with providing comprehensive customer training.

An event highlighting the addition of COPsync software will be necessary and quarterly sales and marketing meeting for sales forecasting will be required.

**3. COMPENSATION AND RELATED MATTERS.**

**A. Compensation for Government Relations and Consulting Services.**

i) **Terms of Compensation.** As consideration for its services, Brandon shall be entitled to a retainer payment in the amount of thirty thousand dollars ($30,000) per month for a period of one (1) year beginning May 28, 2010. Said payments by COPsync are contingent upon receipt by COPsync of investments that COPsync is able to secure, with the assistance of Brandon, for that purpose, up to an amount of three hundred and sixty thousand dollars ($360,000.00) for the initial term of this Agreement.

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc.*
*May 28, 2010*

06/02/2010  13:12   6176950551                    BRANDON ASSOCIATES                 PAGE  04/09

ii) **Terms of Payment.** Retainer payments will be due at the first of each month, starting June 1, 2010, provided that the funds to make such payments referenced above have been received by COPsync. Late payments received after the 10th calendar day of the month shall accrue late fees of 1% per month until paid.

**B. Compensation for Sales.**

i) **Commission Percentage.** In addition to the monthly retainer payments, Brandon will be entitled to a commission equal to amounts actually received by COPsync from Agencies in the Territory in excess of $49.95 per user per month generated from any contract secured as a result of Brandon's efforts on COPsync's behalf. This includes, but is not limited to, those contracts procured as the result of direct marketing and sales efforts conducted by Brandon on behalf of COPsync in conjunction with this Agreement.

ii) **Payment.** Commission payments will be due upon receipt by COPsync from the applicable end-user, payable by the 10th day of following calendar month.

iii) **Contact List.** On a monthly basis, Brandon will provide to COPsync a dated contact list detailing the name of each Agency contacted, address, telephone numbers, email addresses, contact names, number of full-time, part-time, reserve officer licenses available in the agency, and a summary of each meeting or demonstration conducted. This list provided will include a proposed closing date for each contact, based on their internal discussions with the listed agency.

iv) **Duration.** Brandon shall be entitled to the above-defined commission for the full term of this Agreement regardless of whether or not the relationship created in this Agreement is still in existence, has run its course, or has been terminated, provided Brandon continues to provide service to end-user Agencies as described in Section 2 of this Agreement. Brandon shall also be entitled to commission on all subsequent contract renewals, extensions and/or new purchases that are procured by COPsync as the result of business-to-business contractual relationships consummated by Brandon on behalf of COPsync during the term of this Agreement, regardless of whether or not the relationship created in this Agreement is still in existence, has run its course, or has been terminated; provided Brandon continues to provide service to end-user Agencies as described in Section 2 of this Agreement. To the extent Brandon discontinues to provide service to Agencies during the term of this Agreement, commission payments to Brandon for amounts received by COPsync from such Agencies will be reduced by the amount of expenses incurred by COPsync to provide such services to the Agencies.

**C. Expenses.** Remaining monthly payments will include the reimbursement of reasonable directly related expenses incurred outside the Territory by Brandon during the immediately preceding month, inclusive of travel and associated expenses, as required to carry out the services described in Section 2 of this Agreement. Brandon will exercise every effort to minimize expenses incurred on behalf of COPsync and will receive prior written approval from COPsync for all such expenses. COPsync will have no obligation to reimburse Brandon for expenses incurred by Brandon within their Territory, as territorial expenses are covered by the monthly retainer.

**D. Training.** In order to continue to receive commission payments as provided herein Brandon agrees to complete sales and technical training and demonstrate exceptional business performance, measured by revenue, support and training goals.

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc*
*May 28, 2010*

06/02/2010  13:12    6176950551              · BRANDON ASSOCIATES              PAGE  05/09

4. TERMINATION. Either party may terminate this Agreement by written notice if there has been a material breach hereof by the other party, which has not been cured within ten (10) days after the date of written notice of material breach to the breaching party by the non-breaching party.  Liability shall be limited to those services and expenses rendered or incurred as of the notice date, or services yet to be performed in the event that such services have been prepaid.  Any payments due Brandon during the breach period prior to correction will be reduced by the amount of the expenses incurred by COPsync to provide such services to the end-users and off-set against any funds due Brandon under this Agreement.

5. NOTICES. Any notice given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given when delivered either personally or by a nationally recognized overnight courier, or by United States certified or registered mail, return receipt requested, postage prepaid, addresses as follows:

If to COPsync:

Russell Chaney
CEO
COPsync, Inc.
2010 F.M. 2673
Canyon Lake, TX 78133

If to the Brandon:

Donald Flanagan
President & CEO
Brandon Associates, LLC
29 Commonwealth Ave.
Boston, MA 02116

5. MISCELLANEOUS.

A. Ownership and Confidentiality. The work product, documents, information and intellectual property generated by Brandon hereunder are the property of COPsync.  All information provided by COPsync hereunder will be treated as strictly confidential, and will not be shared with any person other than employees of COPsync or Brandon.

B. Indemnification. The parties agree to indemnify and hold harmless each other against any and all liability, claims, suits, losses, costs and legal fees arising from the conduct of the other under this Agreement, other than claims arising from a party's willful misconduct or gross negligence.

C. Assignment. Neither COPsync nor Brandon shall assign any interests in this Agreement without the written consent of the other party.

D. Successors in Interest. This Agreement shall bind and inure to the benefit of Brandon and any successor of Brandon whether by reorganization, merger, consolidation, liquidation, sale or other assignee of Brandon's business or assets

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc*
*May 28, 2010*

**E. Severability.** If any provision of this Agreement is held unenforceable or declared invalid by a court of competent jurisdiction, then such provision will be modified to reflect the parties' intention and shall be ineffective only to the extent of such invalidity. All remaining provisions of this Agreement shall remain in full force and effect.

**F. Effect of Waiver.** The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

**G. Choice of Law and Forum.** This Agreement shall be interpreted under the laws of the State of Texas. Any dispute between the parties must first be attempted to be resolved by mediation in Travis County, Texas. If either party seeks an injunction citing irreparable harm and exigency of the circumstances relief under this Agreement shall be sought from the trial courts of Comal County, Texas. .

**H. Entire Agreement.** This Agreement encompasses the entire agreement of the parties relative to the above described professional services, and supersedes all previous understandings and agreements between the parties, whether oral or written. *This Agreement may only be amended by a written document duly executed by all parties.*

**I. Prior Agreements.** The parties agree that this Agreement supersedes any and all prior agreements which are hereby terminated.

**J. Definitions Tiers (1) (2) (3):**

Tier (1)-Top 15 law enforcement agencies
Tier (2)- Top 16-40 law enforcement agencies
Tier (3) - Top 41-60 law enforcement agencies

EXECUTED as a sealed instrument as of the date first written above.

COPSYNC, INC.

BY:

Printed Name: Russell D. Chaney
Date: 6-7-2010

BRANDON ASSOCIATES, LLC

BY:

Printed Name: Donald B. Flanagan
Date: 4/2/10

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc.*
*May 28, 2010*

such legal action shall be entitled to recover all court costs, reasonable attorney fees, and costs of enforcing or collecting any judgment awarded.

The signatures below shall bind Brandon and COPsync to the terms and conditions of this Agreement. Furthermore, both parties understand, agree and accept the above terms and conditions of this Agreement.

BRANDON ASSOCIATES, LLC

Signature: _____

Title: President / CEO

Address: 29 Commonwealth Ave

City, State, Zip: Boston, MA 02116

Date: 6/2/10

COPSYNC, INC

Signature: _____

Title: CEO

Address: 2010 F.M. 2673

City, State, Zip: Canyon Lake, TX 78133

Date: 6-7-2010

*Referral Compensation Agreement between Brandon Associates, LLC and COPsync, Inc. May 6, 2010*

06/02/2010  13:12  6176950551                    BRANDON ASSOCIATES                    PAGE  07/09

REFERRAL COMPENSATION AGREEMENT

The following represents an agreement (the "Agreement") between Brandon Associates, LLC (hereinafter "Brandon") and COPsync, Inc. (hereinafter "COPsync") in consideration of each other's promises or acts. This Agreement is entered into on May 28, 2010. Pursuant to this Agreement, Brandon has and/or will facilitate meetings and introductions on behalf of COPsync with "Listed Potential Investors" in return for COPsync's agreement to pay Brandon compensation for these introductory services if an investment, either directly or indirectly, results as a consequence of these services.

The Parties agree as follows:

1. DEFINITIONS.

A. Listed Potential Investors. As used herein, "Listed Potential Investors" means entities introduced or referred by Brandon to COPsync. The initial Listed Potential Investors are listed on Exhibit A attached hereto, and additional Listed Potential Investors that may be added to such Exhibit A by submission by Brandon, with COPsync's consent, which consent will not be unreasonably withheld. Listed Potential Investors shall also include those Listed Potential Investor's affiliates and co-investors procured through such Listed Potential Investor.

2. TERMS.

A. Initial Investment. Should a Listed Potential Investor directly or indirectly invest monies, properties, patents (or anything of value) into COPsync and or a COPsync – affiliated project (all are defined as "COPsync"), regardless of the form in which such proceeds are invested within one (1) year after the date of this Agreement, COPsync agrees to pay to Brandon as compensation under this Agreement, unless a different arrangement is agreed upon in writing, in advance, on a case-by-case basis, a "finder's fee" of FIVE PERCENT (5%) of the proceeds (or value) so invested in COPsync.. This compensation shall be based upon the gross amount invested in COPsync, prior to any deductions, expenses, or offsets of any kind, and shall be paid within TEN (10) DAYS following COPsync's receipt of funds (or value). Notwithstanding the foregoing, Brandon will not be entitled to any compensation under this Agreement for any investment in COPsync that is used by COPsync to pay Brandon the retainer required under that certain Agreement for Professional Services, of even date herewith, by and between COPsync and Brandon.

B. Limitation of Services. This Agreement relates solely to Brandon's services rendered in providing COPsync with the Listed Potential Investors and facilitating introductions and meetings with these investors. Brandon is requested to perform no additional services to be entitled to the above compensation in the event that an investment is made. Neither COPsync nor any of its advisors shall directly or indirectly state in any communications, written or oral, with the Listed Potential Investors that Brandon recommends the purchase of any securities. Moreover, Brandon shall not (i) have any contact with any of the Listed Potential Investors with respect to COPsync or the offering of any securities, (ii) advise COPsync or any of its advisors on the terms of any securities, the offering of any securities or the documents relating to the offering of the securities, (iii) provide COPsync or any of the Listed Potential Investors any information in connection with the offering of the securities, (iv) negotiate with either COPsync or any of the Listed Potential Investors with respect to the securities, (v) assist any of the Listed

*Referral Compensation Agreement between Brandon Associates, LLC and COPsync, Inc. May 6, 2010*

Potential Investors in reviewing or completing any of the documents relating to the offering of the securities, or (vi) receive or otherwise handle any of the securities sold to any of the Listed Potential Investors or the funds that any of the Listed Potential Investors deliver in payment for any securities.

*Additionally, Brandon is not (i) a registered "broker" ("Broker") or "dealer" ("Dealer") as such terms are defined in Section 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or (ii) an Investment adviser ("Investment Advisor"), as such term is defined in Section 202(a)(11) of the Investment Advisors Act of 1940, as amended, or comparable state laws, and will not act to effect any transactions in securities for the account of COPsync. With respect thereto and notwithstanding anything set forth herein to the contrary, in connection with the offering of securities, Brandon shall not carry out any activity or function that (i) may be traditionally performed by or otherwise be deemed to include those of a Broker, Dealer or Investment Adviser or (ii) would require Brandon to register itself as a Broker, Dealer, or Investment Advisor. Payments of fees hereunder will be made only in compliance with the respective federal and state security laws, and adjustments and amendments to agreements will be made accordingly. Brandon agrees, if necessary, to register as "finder" or "introducer" in any states requiring it to do so. Brandon acknowledges that COPsync, in its sole discretion, may decline to complete any investment with a Listed Potential Investor for any reason, including, but not limited to, COPsync's determination of the absence of exemptions under applicable securities laws for such investment due to compensation payable to Brandon hereunder.*

E. Miscellaneous.

1)   Successors and Assigns. This Agreement shall be binding upon all parties and their respective estates, heirs, successors, and permitted assigns.

2)   Alterations. This Agreement may be changed only by the written consent of all parties.

3)   Assignment. Neither COPsync nor Brandon shall assign any interests in this contract without the written consent of the other party.

4)   Integration. This Agreement is the entire agreement between COPsync and Brandon regarding the subject matter hereof. There are no understandings, representation, or warranties between the parties concerning this Agreement except as set forth in this Agreement

5)   Severability  The judgment by any court of law that a particular section of this Agreement is illegal shall not affect the validity of the remaining provisions.

6)   Governing Law. It is our intention that this Agreement shall be interpreted under the laws of the State of Texas. Any litigation under this Agreement shall be resolved in the trial courts of Comal County, Texas.

7)   Attorneys' Fees and Costs. Should any legal proceeding be necessary to construe or enforce the provisions of this Agreement, the prevailing party in

*Referral Compensation Agreement between Brandon Associates, LLC and COPsync, Inc. May 6, 2010*

# Exhibit B

# FIRST AMENDMENT
## TO THE
## AGREEMENT FOR PROFESSIONAL SERVICES

This First Amendment to the Agreement for Professional Services is made as of the 30th day of September, 2012 by and between Brandon Associates LLC, Brandon-COPsync, LLC (hereinafter collectively "Brandon"), with a principal place of business located at 29 Commonwealth Avenue, Suite 901 Boston, Massachusetts, 02116 and COPsync, Inc. (hereinafter "COPsync") with a principal place of business located at to 5001 Spring Valley Road, Suite 825W, Dallas, Texas, 75244-8225 (each a "Party" and collectively "the Parties").

WHEREAS, Brandon and COPsync have been operating under an Agreement for Professional Services and a Trademark License Agreement (collectively the "Agreement for Services") dated June 2, 2010 authorizing Brandon to re-license/re-sell COPsync's products and services to end users; and

WHEREAS, the parties' business relationship has grown and changed and they anticipate continued growth, and the Parties have determined that it is in their best mutual interests to amend the Agreement for Services; and

WHEREAS, the parties agree that the Brandon mission is to focus on National Distribution of the COPsync products, including a) Reselling COPsync products based on geographic and opportunity defined territories, b) Recruiting Top-tier Federal, State and Local agencies as COPsync users and reference accounts, c) Recruiting Top-tier System Integrators and Prime Contractors as Brandon-COPsync resellers, and d) Recruiting Top-tier Resellers with National Distribution Channels as Brandon-COPsync resellers.

NOW THEREFORE, Brandon and COPsync, in consideration of the mutual promises made in this Amendment and for other good and valuable consideration, have agreed to amend the Agreement for Services as set forth below.    Except as explicitly modified by this Amendment, the Agreement for Services shall otherwise remain unchanged and in full force and effect.    As used herein, the term "Agreement for Services" includes the provisions of this First Amendment.

1.    Assignment.  All rights and responsibilities of Brandon Associates, LLC pursuant to the Agreement for Services are hereby assigned to and assumed by Brandon-COPsync, LLC.

2.    Duration.

2.1    The Term as defined in Paragraph 1B of the Agreement for Services is extended for a period of five (5) years through September 30, 2017.  The Term shall thereafter be deemed to renew annually provided that neither Party is in material breach of the Agreement or has given written notice to the other at least 90 days prior to the expiration of the then Term that such Party does not desire to renew.

2.2    Notwithstanding the above, in the event of termination or expiration of the Agreement for Services, Brandon shall be entitled to receive its percentage share of the gross revenue of any sale or license of COPsync's services or product to an end-user agency or customer for which Brandon is directly responsible, or for any sale or license to an agency or customer by a Third Party Partner (defined below) that was registered with COPsync by

1.

 

Brandon. Brandon shall be entitled to its share of such Gross Revenue (defined below) so long as such end-user agency or customer uses the COPsync service or product and so long as Brandon continues to fulfill its contractual obligations to that customer, whether arising under the customer end-user agreement, the Agreement for Services, or otherwise, and such sharing shall be reinstated if a customer reengages after termination or the lapse of its end-user license agreement.

2.3     Gross Revenue shall be defined as the total revenue, whether one-time or recurring, derived from a sale or license of COPsync's services and products, before the deduction of any fee split, fee sharing or commission to any Party, including a Third Party Partner.

3.      Territory.

3.1     Brandon shall have the exclusive right to market, sell and license COPsync's services and products in the Geographic Territory as described in Section 2D of the Agreement for Services, and shall have the exclusive right to market, sell and license the COPsync services and products in any additional territory or through any Third Party Partner or to any specific Agency or Customer for whom it is granted exclusivity as provided herein. As of the date of the First Amendment, the geographical locations, Third Party Partners and specific agencies and customers shown on Exhibit A have been registered with COPsync and, consequently, are included within the Territory, as an Agency or as a Third Party Partner.   As new Territories, Agencies and Third Party Partners are registered, Exhibit A will be deemed updated and incorporated into the Agreement for Services.

3.1.1   Regarding additional Geographic Territories, Brandon shall request registration of exclusivity for additional geographically defined territories on the basis of a) establishing a Brandon sales presence within reasonable proximity to the territory (e.g., a specific State or grouping of States), and Brandon will identify to COPsync the designated sales resource assigned to the territory. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant.  Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated.

3.1.2   Regarding registration of additional Agencies, Brandon shall request registration of exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant.   Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated.

3.1.3   Regarding registration of additional Multi-agency Territories, Brandon shall request registration of exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant.   Unless otherwise determined by COPsync in the

2

exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated. An example of a Multi-agency Territory includes, but is not limited to, Brandon's exclusive right to market and sell to all agencies within Los Angeles County, California.

3.1.4   Regarding registration of additional Multi-territorial Agencies, Brandon shall request registration of exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant.   Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated.  For the purposes of the Agreement for Services, Multi-territorial Agency means a single Agency that operates throughout more than one geographic area, such as the Federal Bureau of Investigation.

3.2   Upon grant and registration of the exclusivity, Brandon shall be subject to the terms and conditions of the exclusivity grant, if any imposed by COPsync pursuant to the registration standards established by this Agreement, and have the exclusive right to market, sell and license COPsync services and products in the additional Geographic Territory or to the additional Agency, Federal Agency, Multi-agency Territory, Multi-territorial Agency, or via Third Party Partner, as the case may be, as though it were an agency or partner within a defined Territory as those listed in Section 2D of the Agreement for Services or EXHIBIT A of this First Amendment. For the purposes of the Agreement for Services, Third-party Partner shall mean a Partner that operates throughout more than one geographic area, such as Raytheon Company.

3.2.1   Possible channel conflicts with other COPsync partners on specific opportunities in specific geographic territories will be identified by Brandon and COPsync, and an equitable work-around mutually negotiated on a case-by-case basis. Brandon is prepared to support multiple Prime Contractors on specific competitive opportunities.

3.2.2   With regard to the registration of exclusivity process, Brandon understands that COPsync will from time-to-time in the exercise of its sole discretion, appoint distributors/resellers for territories/customers (or specifically retain for itself territories/customers) that have not been granted exclusively to Brandon.  COPsync shall promptly notify Brandon of the grant of exclusivities to other persons or territories/customers specifically retained for COPsync so that channel conflict can be avoided.

3.3   COPsync agrees to refer to Brandon all contacts from Territories, additional Geographic Territories, additional Agencies, Multi-agency Territories, Multi-territorial Agencies, federal agencies, and Third Party Partners for which Brandon has been granted exclusivity as provided herein.  Likewise, Brandon agrees to do the same with respect to those territories or customers for whom COPsync has retained or assigned the exclusive sales and marketing rights, assuming that Brandon has been notified of the same as provided in paragraph 3.2.2. Additionally, COPsync may from time-to-time forward to Brandon sales contacts from unregistered and unreserved territories and customers; Brandon will be granted first opportunity to immediately engage with these customers for the purpose qualifying such leads and pursuing sales activities, and failure to do so will



3



cause the lead to revert to COPsync for reassignment or reservation to COPsync. Also, if requested by COPsync, Brandon may from time-to-time agree to support any sales efforts to top-tier Agencies or opportunities (e.g., Brandon leading Request For Proposal (RFP) response efforts) that have not been exclusively assigned to Brandon. In these circumstances, Brandon and COPsync shall negotiate reasonably and in good faith with the objective of providing for an equitable division of resulting revenue as and if applicable to the situation. Also, the grant of exclusivity herein shall not prevent COPsync from working as a vendor or subcontractor to other persons with respect to RFP response efforts, except as such would violate the grant of exclusivity to Brandon per the terms of this Agreement  Additionally, COPsync and Brandon acknowledge that there may be RFP situations where Brandon is not in a position to bid COPsync and because of Brandon's exclusivity, COPsync would thereby be locked out of bidding the RFP. In those situations, Brandon and COPsync shall negotiate reasonably and in good faith with the objective of the negotiation being to allow COPsync to submit an RFP response while providing for an equitable division of resulting revenue as and if applicable to the situation.

4.  **Certain Provisions Applicable to Third Party Partners / Value Added Resellers.**

4.1  Brandon shall have the exclusive right to re-sell COPsync Products through Third Party Partners for whom exclusivity has been granted as provided in this Agreement. As of the date hereof, the Raytheon Company and its corporate affiliates, including, but not limited to, Raytheon JPS (collectively, "Raytheon Company"), has previously been identified and registered by Brandon as a Third Party Partner. With respect to Raytheon Company in particular, all gross revenue derived from the sale or license of COPsync's products and services, less Raytheon's 30% commission (this is an estimate of their maximum commission which shall be subject to COPsync reasonable review and approval), shall be divided evenly between COPsync and Brandon, e.g., at an effective rate of 35% of gross revenue each.

4.1.1  Apart from those categories specifically addressed in this Amendment, it is recognized that for specific opportunities and / or partnering arrangements, alternative division of revenue may be negotiated on a case-by-case basis (e.g., based on a non-standard division of service labor between Brandon, COPsync, and the Third Party).

4.2  Regarding registration of additional Third Party Partners, Brandon shall request exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant. Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated. After registration, Brandon and COPsync shall negotiate in good faith to determine on a case-by-case basis the Parties' respective share of the resulting Gross Revenues for any sale or license by the Third Party Partner of COPsync's services or products.

4.3  It is anticipated that Third Party Partners may require a separate contract between Brandon, COPsync and the Partner, in which event Brandon and COPsync agree to



-4-

$\mathcal{RAW}$

cooperate and negotiate in good faith in the drafting and execution of such contracts provided they reflect the minimum economic terms agreed to in this Agreement.

5.     Certain Provisions Applicable to Agency Licensing.

5.1    Brandon may market, license and sell COPsync's products and services, either directly or with a Third Party Partner, to large agencies at a discounted rate and without the prior written approval of COPsync so long as such discounts comply with the following pricing structure:

- 1-99 Employees (defined as Sworn, Reserve and Admin/Clerical): Monthly license fee of $60.00 per employee (no greater than 40% discount from current individual user license pricing).

- 100-500 Employees: Monthly license fee of $45.00 per employee (no greater than 55% discount from current individual user licensing pricing).

- 500+ Employees: Monthly license fee of $30.00 per employee (no greater than 70% discount from current individual user licensing pricing).

5.2    Brandon is authorized to sell or license COPsync's products and services to large agencies and enterprises at rates in excess of the above pricing structure, without the prior written approval of COPsync.

5.3    Brandon may sell or license COPsync's products and services to large agencies at rates lower than the above-pricing structure only with the prior written approval of COPsync. In such event, Brandon and COPsync shall negotiate in good faith to come to an agreement on any further discounts of COPsync's products and services. From time to time, Brandon may propose pricing to an agency of any size, either directly or via a third party, that is lower than the above pricing structure for strategic reasons (e.g., an early adopter or lead agency in a state or region, or a prospective distributor / reseller partner), or to provide such with a limited number of "demonstration licenses" at no charge, and Brandon will first obtain COPsync approval, with the understanding that whatever resulting revenue will be split evenly.

5.4    All revenue from the sale or license of COPsync's products and services based on the above price structure (less any Third Party Partner share if applicable) shall be split evenly between Brandon and COPsync, unless otherwise mutually agreed in writing in advance of the sale or license.

5.5    Certain Provisions Applicable to Federal Agencies. With respect to the Federal Bureau of Investigation and the Secret Service, Brandon shall have the exclusive right to market, sell and license the COPsync's services and products to these federal agencies as described in Section 2D of the Agreement for Services.

Regarding registration of additional federal agencies, Brandon shall request exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of

5



such grant.   Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated.

With respect to the Department of Homeland Security and Customs and Border Protection, Brandon shall have the right to market, sell and license the COPsync services and products to these federal agencies. It is specifically contemplated that COPsync shall also be marketing, selling and licensing COPsync's services and products to these federal agencies at the state and local level.  COPsync shall also have the right to market, sell and license the COPsync's services and products to these agencies at the federal level; however, COPsync shall not initiate any such activities at the federal level without first discussing the situation with Brandon with the objective of the discussion to be eliminating or mitigating any channel, sales, messaging or other conflicts, and negotiating an equitable division of resulting revenue as and if applicable to the situation.

6.     Additional Services.

6.1    COPsync may offer products or services in addition to the COPsync information sharing, communication and data interoperability network, including, but not limited to, products in development such as "WARRANTsync" and "VIDTAC."

6.2    The parties shall negotiate in good faith for the authorization of Brandon to market, license and sell WARRANTsync at such time, if any, that COPsync makes WARRANTsync generally available to COPsync's reseller network.   Brandon may decline, at its sole discretion, marketing, licensing and selling WARRANTsync.

6.3    Brandon is hereby authorized, but is not obligated, to market, license and sell VIDTAC under the Agreement for Services.  The parties shall at a future date negotiate in good faith the terms and conditions between COPsync and Brandon for the marketing, licensing and sale of VIDTAC at such time as COPsync determines its own terms and conditions relating to offering VIDTAC to COPsync's reseller network.

7.     Technical Support. In the event that Brandon enters into a Third Party Partner contract in which technical support and training are contracted away to the Third Party Partner, then COPsync and Brandon shall be relieved of those obligations as otherwise would be required under the Agreement for Services.

8.     Miscellaneous.

8.1    Paragraphs 3A (i) and (ii) regarding COPsync's compensation to Brandon Associates for Government Relations and Consulting Services are deleted with all such payments having already been fully made by COPsync.

8.2    Paragraph 3B (ii) is hereby amended in its entirety to read as follows:

> **ii) Payment.** Upon receipt by either party of the monthly or annual license fee from an applicable end-user, any payments or Gross Revenue sharing due to the other party shall be payable by the end of the following calendar month.



6

8.3     Paragraph 3B (iii) is hereby deleted.

8.4     Paragraph 3C regarding COPsync payment of Brandon Associates expenses is hereby deleted.

8.5     Paragraph 5 is hereby amended by adding the following:  "A party may change its address for notice under this Agreement by providing written notice to the other party in the manner stated above."

COPsync hereby provides notice that its address for notices is changed to 5001 Spring Valley Road, Suite 825W, Dallas, Texas 75244-8225.

8.6.    Paragraph 5D is hereby amended in its entirety to read as follows:

> **D. Successors in Interest.** This Agreement shall bind and inure to the benefit of Brandon and COPsync and their respective successors-in-interest whether by reorganization, merger, consolidation, liquidation, sale or other assignee of their business or assets.

8.7     Paragraph 5G is hereby amended to substitute "Dallas County" for "Travis County" and "Comal County."

In witness whereof the Parties have executed this First Amendment as of the date set forth above.

COPSYNC, INC

By:  Ronald A. Woessner, CEO

BRANDON ASSOCIATES, LLC
BRANDON-COPSYNC, LLC

By:  Donald B. Flanagan, Manager

7

## EXHIBIT A

## REGISTERED TERRITORIES, AGENCIES and THIRD PARTY PARTNERS

### Registered Territories

1. Massachusetts;
2. Connecticut;
3. New Hampshire;
4. Vermont;
5. Maine;
6. Rhode Island; and
7. New Jersey.

### Registered Additional Geographies

8. Los Angeles County, California;
9. New York State, including the New York Police Department;
10. Dayton, Ohio

### Registered Federal Agencies

11.

    a. Federal Bureau of Investigation
    b. Department of Homeland Security
    c. Customs and Border Protection
    d. Secret Service

### Registered Third Party Partners

12. The Raytheon Company.

| **CIVIL ACTION COVER SHEET** | TRIAL COURT OF MASSACHUSETTS<br>SUPERIOR COURT DEPARTMENT<br>COUNTY OF   ESSEX | DOCKET NO. 2015 – 212 |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| **Brandon-COPsync, LLC** | **COPsync, Inc., Ronald A. Woessner, Russell D. Chaney, and J. Shane Rapp** |

| Plaintiff Atty | Cynthia Guizzetti, Nutter McClennen & Fish LLP | Type Defendant's Attorney Name |
|---|---|---|

| Address | Seaport West, 155 Seaport Boulevard |
|---|---|

Defendant Atty _____

Address _____

| City | Boston | State | MA | Zip Code | 02210 |
|---|---|---|---|---|---|

| City | | State | | Zip Code | |
|---|---|---|---|---|---|

| Tel. | +1 (617) 439-2000 | BBO# | 653,858 |
|---|---|---|---|

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO.          TYPE OF ACTION (specify)          TRACK                                    IS THIS A JURY CASE?

**B99 Other Tort (specify) - Fast Track**

[ •] Yes      [  ]  No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages.  For this form, disregard double or treble damage claims; indicate single damages only.

## TORT CLAIMS
### (Attach additional sheets as necessary)

A.   Documented medical expenses to date:
   1.   Total hospital expenses    $_____
   2.   Total doctor expenses    $_____
   3.   Total chiropractic expenses    $_____
   4.    Total physical therapy expenses    $_____
   5.   Total other expenses (describe)    $_____
                                        Subtotal $_____
B.   Documented lost wages and compensation to date    $_____
C.   Documented property damages to date    $_____
D.   Reasonably anticipated future medical expenses    $_____
E.   Reasonably anticipated lost wages and compensation to date    $_____
F.   Other documented items of damages (describe)    $_____
G.   Brief description of plaintiff's injury, including nature and extent of injury (describe)

Total $_____

FILED
IN THE SUPERIOR COURT
FOR THE COUNTY OF ESSEX
FEB 12 2015

## CONTRACT CLAIMS
### (Attach additional sheets as necessary)

Provide a detailed description of claim(s):

| See attached description of tort and contract claims | TOTAL   $.............. |
|---|---|

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods.

Signature of Attorney of Record _____          Date: 2/12/15

A.O.S.C. 3-2007

Attachment To Civil Action Cover Sheet

Brandon-COPsync, LLC v. COPsync, Inc. et al.

Tort Claims

**G. Brief Description of plaintiff's injury, including nature and extent of injury**

Defendant, a business partner of Plaintiff, made misrepresentations to Plaintiff and committed unfair and deceptive trade practices.

                                                     **Total: tbd**

Contract Claims

The acts described above were in violation of Defendant's Contact with Plaintiff.

                                                     **Total: tbd**

2739920.1

# Commonwealth of Massachusetts
## County of Essex
## The Superior Court

CIVIL DOCKET # ESCV2015-00212-D
Courtroom CtRm 1 (Lawrence)

RE: Brandon COPsync LLC v COPsync Inc et al
TO:

Cynthia M Guizzetti, Esquire
Nutter McClennen & Fish
World Trade Center West
155 Seaport Boulevard
Boston, MA 02110

## SCHEDULING ORDER FOR F TRACK

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated, and case shall be resolved and judgment shall issue **12/03/2016**.

| STAGES OF LITIGATION | DEADLINES | | |
|---|---|---|---|
| | SERVED BY | FILED BY | HEARD BY |
| Service of process made and return filed with the Court | 05/13/2015 | 05/13/2015 | |
| Response to the complaint filed (also see MRCP 12) | | 06/12/2015 | |
| All motions under MRCP 12, 19, and 20 | 06/12/2015 | 07/12/2015 | 08/11/2015 |
| All motions under MRCP 15 | 06/12/2015 | 07/12/2015 | 08/11/2015 |
| All discovery requests and depositions served and non-expert depositions completed | 12/09/2015 | | |
| All motions under MRCP 56 | 01/08/2016 | 02/07/2016 | |
| Final pre-trial conference held and/or firm trial date set | | | 06/06/2016 |
| Case shall be resolved and judgment shall issue by **12/03/2016** | | | **12/03/2016** |

- **The final pre-trial deadline is not the scheduled date of the conference.**
- **You will be notified of that date at a later time.**
- **Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

Dated: 02/18/2015

Thomas H. Driscoll Jr.
Clerk of the Court

Telephone: (978) 242-1900

**Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617) 788-8130** --Check website as to status of case: http://ma-trialcourts.org/tcic 1312583 inidoc01 exarhose

# ORDER FOR ENTRY OF JUDGMENT OF DISMISSAL NISI
## ( FOR WANT OF PROCEDURAL AMOUNT )

**Trial Court of Massachusetts**
**The Superior Court**

| DOCKET NUMBER | | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|---|
| **1577CV00212** | | |
| CASE NAME: | | COURT NAME & ADDRESS |
| Brandon COPsync LLC<br><br>vs.<br><br>COPsync Inc et al | | Essex County Superior Court – Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

Judgment Nisi is hereby ordered in the above-entitled action, it appearing from the Statement filed with the Complaint (and with the answer) detailing the facts on which the plaintiff relies to determine money damages that there is no reasonable likelihood that recovery by the Plaintiff will exceed $25,000.

Therefore, Plaintiff(s) and Defendant(s) are hereby notified that final Judgment of Dismissal will be entered fourteen days from the entry of this Judgment Nisi, on 04/21/2015, subject to the right of the parties to file written responses to this Judgment of Dismissal Nisi and to request a hearing on the issue no later than said entry of judgment date.

If any party files a timely request for a hearing on the issue of dismissal for want of procedural amount, all parties will be notified of the date and time that the Court has scheduled said hearing.

| DATE | DOCKET JUDGE | CLERK OF COURTS/ ASSISTANT CLERK |
|---|---|---|
| **05/05/2015** | **Hon. Robert A Cornetta** | X |

Date/Time Printed: 04-07-2015 12:48:44

SCV125 8/2014

3

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS

SUPERIOR COURT
C.A. No. 2015-0212D

Brandon-COPsync, LLC

    Plaintiff,

v.

COPsync, Inc., Ronald A. Woessner, Russell
D. Chaney, and J. Shane Rapp

    Defendants.

**FILED**
IN THE SUPERIOR COURT
FOR THE COUNTY OF ESSEX

APR 1 5 2015

_Thomas H. Driscoll_
CLERK

### RESPONSE TO ORDER FOR ENTRY OF
### JUDGMENT OF DISMISSAL NISI AND REQUEST FOR HEARING

Pursuant to the Court's Order for Entry of Judgment of Dismissal Nisi for Want of

Procedural Amount ("Order") (copy at Tab A), Brandon-COPsync, LLC ("BACS") submits this

written response and requests that the Court remove the Judgment Nisi and conduct a hearing. As

grounds for this request, BACS states as follows:

1.     On February 12, 2015, BACS filed its Verified Complaint (copy at Tab B)

asserting the following claims against COPsync, Inc. ("COPsync"), Ronald A. Woessner, Russell

D. Chaney, and J. Shane Rapp (collectively, "Defendants"): breach of contract (against

COPsync); breach of the covenant of good faith and fair dealing (against COPsync); promissory

estoppel (against COPsync); intentional misrepresentation (against all Defendants); negligent

misrepresentation (against all Defendants); interference with advantageous business relations

(against COPsync); and violation of 93A (against all Defendants). BACS also seeks a declaratory

judgment on the issue of whether COPsync has terminated its contract with BACS.

2.     The original civil-action cover sheet undersigned counsel filed (copy at Tab C)

did not identify the "Total" damages BACS is seeking.

3.      For that reason, it appears, the Order was issued. According to the Order, "it appear[s] from the Statement filed with the Complaint . . . that there is no reasonable likelihood that recovery by Plaintiff will exceed $25,000."

4.      The Order provides that the parties have the right "to file written responses to this Judgment of Dismissal Nisi and to request a hearing on the issue no later than 4/21/2015."

5.      This case arises out of a business partnership and contract between BACS and COPsync. As reflected on the face of the Verified Complaint, BACS has sought out investors and taken on loans based on promises and representations made by COPsync. Ten investors have invested $1,200,000.00 in equity in BACS, and eleven investors have loaned BACS $6,273,739.00. As further stated on the face of the Verified Complaint, BACS has 77 customers, including the entire state of New Hampshire, whose relationship with BACS is dependent upon the contract at issue in this lawsuit. In sum, although the extent of the damages are difficult to calculate at this time, BACS seeks no less than $4,000,000 in damages plus interest, costs, and attorneys' fees. Thus, the amount of damages claimed is well beyond the $25,000 jurisdictional threshold established by G.L. c. 212, § 3.[1]

6.      Attached at Tab D is an amended civil-action cover sheet delineating in detail the damages BACS seeking. (BACS will separately file the amended civil-action cover sheet if authorized or directed to do so.)

7.      It is black-letter law that courts prefer to resolve cases on their merits. *See Scannell v. Ed. Ferreirinha & Irmao, LDA*, 23 Mass. App. Ct. 465, 470 (1987).

---

[1] Civil actions may proceed in the Superior Court only if there is "no reasonable likelihood that recovery by the plaintiff will be less than or equal to $25,000." G.L. c. 212, § 3.

2

8.     Pursuant to the Order and G.L. c. 212, § 3A(b),[2] BACS requests a hearing on this matter on or before April 21, 2015.

WHEREFORE, BACS requests that this Court set aside the Judgment of Dismissal Nisi for Want of Procedural Amount. A hearing on this matter is requested.

Brandon-COPsync, LLC

By its attorneys,

Cynthia M. Guizzetti (BBO# 653858)
cguizzetti@nutter.com
Joseph T. Toomey (BBO# 682675)
jtoomey@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:   (617) 439-2000
Facsimile:   (617) 310-9000

Dated: April 15, 2015

## CERTIFICATE OF SERVICE

The complaint has not yet been served on defendants and plaintiff has until May 13, 2015 to do so. I certify that I will serve a true and correct copy of this document on defendants when the complaint is served.

Joseph T. Toomey

2782325.1

---

[2] G.L. c. 212, § 3A(b), provides in relevant part:

If it appears to the court, from the statement of damages by the plaintiff that there is no reasonable likelihood that the estimated damages will be consistent with the civil money damage limits of the court, as set forth in section 3, the judge, after receiving written responses from the parties and after a hearing, if requested by any party, may dismiss the case without prejudice for failure to comply with the requirements of said section 3 regarding the amount necessary for proceeding in the superior court.

3

# Exhibit A

| ORDER FOR ENTRY OF JUDGMENT OF DISMISSAL NISI ( FOR WANT OF PROCEDURAL AMOUNT ) | Trial Court of Massachusetts<br>The Superior Court |
|---|---|

| DOCKET NUMBER<br>1577CV00212 | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|

| CASE NAME:<br><br>Brandon COPsync LLC<br><br>vs.<br><br>COPsync Inc et al | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |
|---|---|

Judgment Nisi is hereby ordered in the above-entitled action, it appearing from the Statement filed with the Complaint (and with the answer) detailing the facts on which the plaintiff relies to determine money damages that there is no reasonable likelihood that recovery by the Plaintiff will exceed $25,000.

Therefore, Plaintiff(s) and Defendant(s) are hereby notified that final Judgment of Dismissal will be entered fourteen days from the entry of this Judgment Nisi, on 04/21/2015, subject to the right of the parties to file written responses to this Judgment of Dismissal Nisi and to request a hearing on the issue no later than said entry of judgment date.

If any party files a timely request for a hearing on the issue of dismissal for want of procedural amount, all parties will be notified of the date and time that the Court has scheduled said hearing.

| DATE<br>05/05/2015 | DOCKET JUDGE<br>Hon. Robert A Cornetta | CLERK OF COURTS/ ASSISTANT CLERK<br>X |
|---|---|---|

# Exhibit B

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                                    SUPERIOR COURT

| |
|---|
| Brandon-COPsync, LLC |
| |
|      Plaintiff, |
| |
| v. |
| |
| COPsync, Inc., Ronald A. Woessner, Russell D. Chaney, and J. Shane Rapp |
| |
|      Defendants. |

Civil Action No. ___2015- 212 D___

## VERIFIED COMPLAINT AND JURY DEMAND

### Nature of the Action

This case arises from actions by defendant COPsync, Inc. ("COPsync") designed to leave its business partner, plaintiff Brandon-COPsync, LLC ("BACS"), with no choice other than to submit to COPsync's unjustified demand that BACS agree to modify the terms of the parties' contract to allow COPsync to avoid complying with terms it no longer finds favorable. When BACS declined to renegotiate, COPsync served BACS with a notice of default and notified BACS that it was unilaterally rescinding valuable exclusivity rights BACS had under the contract. Since then, COPsync has committed further breaches of contract. This action also addresses misrepresentations made by COPsync over time as well as other wrongs.

### Parties

1.      BACS is a Massachusetts limited liability company with its principal place of business at 222 Rosewood Drive, Suite 810, Danvers, Massachusetts 01923.

2.      COPsync is a Delaware corporation with its principal place of business at 2010 FM 2673, Canyon Lake, Texas 78133.

FILED
IN THE SUPERIOR COURT
COUNTY OF ESSEX

FEB 12 2015

CLERK

## Jurisdiction and Venue

3.    Jurisdiction in this Court is proper pursuant to G.L. c. 212, §§ 3, 4 and G.L. c. 231A, § 1. This Court has personal jurisdiction over COPsync pursuant to G.L. c. 223A, § 3.

4.    Venue is proper pursuant to G.L. c. 223, §§ 1, 8.

## Facts

COPsync's Products

5.    COPsync manufactures three main products: the COPsync Enterprise software; COPsync 911 Threat Alert Software; and VidTac In Car Video Camera.

6.    With regard to COPsync Enterprise, COPsync's website states that it "operates the nation's largest law enforcement real-time, information sharing, communication, and data interoperability network. COPsync's mobile application enables officers to instantly access local, state, and federal law enforcement databases, efficiently gather information at the point of incident, and immediately share critical data with all officers on the COPsync network."

7.    The COPsync 911 product is a "'real-time alert system' that immediately connects the staff of a building under potential threat with the five officers closest to the building's location" through a real-time connection. This revolutionary product generates a lot of interest from schools interested in improving their security protocols.

8.    VidTac is a software driven video that is intended to replace the typical video system in many patrol cars with software that can be installed on the in-vehicle PCs.

The Parties Entered Into a Contract

9.    BACS first became aware of COPsync in June 2009 when COPsync contacted BACS.

2

10.     COPsync made numerous representations about its products to induce BACS to work with it. For example, and without limitation, COPsync represented that COPsync Enterprise was ready for nationwide deployment. These statements were made by Russell Chaney, COPsync's co-founder and Chairman, and Shane Rapp, COPsync's co-founder and President, to Don Flanagan, BACS's Chief Executive Officer, and others in meetings held in Boston in June 2009.

11.     Based on representations made by COPsync, BACS (in the name of Brandon Associates, LLC) entered into an Agreement for Professional Services with COPsync dated June 2, 2010 (the "Contract"). A copy of the Contract is attached hereto as Exhibit A.

12.     Under the Contract, BACS agreed to provide government relations and consulting services to COPsync, including by facilitating meetings with key officials, seeking grant funding, and pursuing government procurement opportunities.

13.     BACS also agreed to work to facilitate the sale of COPsync's products to federal, state, and local law enforcement agencies and public safety agencies in Massachusetts, Connecticut, New Hampshire, Vermont, Maine, Rhode Island, New Jersey, and federal agencies in the District of Columbia, as well as additional agencies by agreement.

14.     In addition, BACS was obligated to provide comprehensive technical support, including by providing training to all potential customers.

15.     During the life of the Contract, Rapp visited BACS in Boston approximately 8 times to educate and train BACS on COPsync products.

3

The Parties Amended Their Contract

16.     Over time, the relationship between the parties grew and changed. In a May 2012 meeting in Boston, Ronald Woessner, COPsync's Chief Executive Officer, affirmatively told Donald Flanagan, BACS's Chief Executive Officer, that COPsync did not want to, and would not, sell its products outside of Texas. Because COPsync wanted to remain a manufacturer, and not a seller, COPsync wanted to expand its relationship with BACS so that BACS would sell COPsync products nationwide.

17.     At an August 12, 2012 meeting with the Los Angeles Police Department Counter Terrorism & Special Operations Bureau, COPsync represented to both BACS as well as the potential customer that the COPsync Enterprise system works with any existing records management system, computer aided dispatch, jail, and court management software. COPsync also stated that the product works with an agency's current electronic infrastructure and that the product can exchange information among various databases. BACS later learned (around January 2013) that these statements were not true.

18.     In anticipation of continued growth, and based on COPsync's representations, the parties agreed to amend the Contract (the "First Amendment") and did so on September 30, 2012. A copy of the First Amendment is attached hereto as Exhibit B.

19.     The parties agreed in the First Amendment that BACS's "mission is to focus on National Distribution of COPsync products."

20.     Accordingly, under the Contract, as amended, BACS had the exclusive right to market, sell, and license COPsync's products and services in the same geographic regions as before (Massachusetts, Connecticut, New Hampshire, Vermont, Maine, Rhode Island, New Jersey) and to the same agencies as before, as well as in and to the following territories, agencies,

4

and partners: Los Angeles County, California; New York State; Dayton, Ohio; the Federal Bureau of Investigation; the Department of Homeland Security; Customs and Border Protection; the Secret Service; and The Raytheon Company.

21.    In addition, under the terms of the First Amendment, BACS was able to expand its exclusivity for additional territories by requesting from COPsync registration of exclusivity for territories where BACS had established a sales presence within reasonable proximity to the territory and BACS was able to identify to COPsync the sales resource assigned to the territory. COPsync was not to unreasonably withhold its assent to requests for such additional exclusivity. Under the terms of the First Amendment, such exclusivity was to be automatically extended as work progress was demonstrated.

22.    Similarly, BACS was able to expand its exclusivity for additional agencies, "Multi-agency Territories," and "Multi-territoral Agencies" by requesting registration of exclusivity from COPsync "once initialized via [BACS] sales contact and continuing work product." As with additional territories, COPsync was not to unreasonably withhold its assent to requests for such additional exclusivity, and such exclusivity was to be automatically extended as work progress was demonstrated.

23.    Once exclusivity was established, BACS had the exclusive right to market, sell, and license COPsync products and services in those territories and to those agencies and partners. COPsync also agreed to refer to BACS all contacts from the territories and agencies within BACS's exclusivity.

24.    BACS remained obligated to provide technical support as before.

5

25.     As payment for BACS's services, BACS was entitled to a commission equal to amounts actually received by COPsync in excess of $49.95 per user per month generated from any contract secured as a result of BACS's efforts.

BACS Expanded Its Business

26.     In reliance on COPsync's promises to provide BACS with exclusivity in additional territories and for additional agencies, BACS invested significantly in building up a sales and technical support infrastructure dedicated to its exclusive territories and agencies. BACS employed full-time employees in the mid-west region (based in Michigan), in the southeastern region (based in Tennessee), in the mid-atlantic region (based in New York), and other employees in Virginia and Massachusetts.

27.     In light of the growth and potential future growth of its business based on the promises of exclusivity and the representations of the products, BACS sought out investors to enable it to grow its business. To date, ten investors have invested $1,120,000 in equity in BACS. In addition, eleven investors have issued loans to BACS in the amount of $6,273,739. All of these investments were made in reliance on the understanding that BACS would have the exclusive right to sell COPsync's revolutionary products virtually nationwide. Woessner was aware of, and actively supported and participated in, BACS's efforts to increase investment in BACS so that BACS could sell COPsync products nationwide.

28.     As of December 2014, BACS had successfully secured exclusivity in 40 territories: Alabama; Arizona; California; Colorado; Connecticut; Delaware; Florida; Georgia; Idaho; Illinois; Indiana; Iowa; Kansas; Kentucky; Maine; Maryland; Massachusetts; Michigan; Minnesota; Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New York; North Carolina; North Dakota; Ohio; Oregon; Pennsylvania; Rhode Island; South Carolina; South

6

Dakota; Tennessee; Vermont; Virginia; Washington; West Virginia; Wisconsin; Wyoming. BACS had also registered exclusive reseller and strategic partnerships with School Safety Advocacy Council, Constellation Software, Harris Corporation, Raytheon, UNICOM (formerly "GTSi"), SecureWatch24, Patrol PC, Imperial Municipal Partners, Interstate Arms Corporation, Adamson Industries, Foundation for School Safety and Security, BeSafe Technologies, and Central Equipment Company.

29. BACS also has a number of agreements with resellers and strategic partners, all of which rely on COPsync's performance under the Contract, as amended.

30. BACS has been very successful in marketing COPsync's products. For example, BACS entered into an agreement with the entire state of New Hampshire for the purchase of the COPsync 911 product. Overall, BACS has sold products to 77 customers and has a number of promising potential contracts.

Problems With COPsync Products

31. At the time the First Amendment was entered into, the WARRANTsync and VidTac products were still under development.

32. On or around September 2012, COPsync informed BACS that the VidTac product was ready to be marketed.

33. BACS was successful in selling many VidTac products, including to the North Haven, Connecticut Police Department. After the system was installed, however, both BACS and the North Haven Police Department discovered that the product does not work as represented by COPsync. After trying for nearly a year to resolve the camera and software issues, the North Haven Police have informed BACS that they wish to terminate their relationship with BACS.

7

34.     BACS experienced similar functionality issues with COPsync 911. For example, BACS learned in 2014 that COPsync 911 does not have the functionality to operate in the software systems used in Saugus, Massachusetts.

35.     It was only on September 29, 2014, that one of COPsync's vice-presidents finally admitted that COPsync Enterprise is available only in Texas and that it would have limited functionality in other jurisdictions.

36.     COPsync has continued to misrepresent its products to BACS. For example, the COPsync 911 product originally contained an "Officer Needs Assistance" button. BACS signed a contract with the State of New Hampshire for the purchase of the COPsync 911 product with that functionality. However, after that contract was signed and the product was deployed to New Hampshire, COPsync removed that functionality from the software platform, meaning the customer did not receive the product it purchased.

37.     These product issues have interfered with BACS' relationships with many of its customers. For example, on February 4, 2015, COPsync put the COPsync 911 system on maintenance mode for over five hours in the middle of the day during school hours, such that no alerts could be sent or received. COPsync provided no advance notice to BACS customers of the need to put the system in maintenance mode such that alternative security protocols could have been implemented.

38.     Around the same time period, a number of BACS's customers tried to use the COPsync 911 system in some fashion and discovered that the system they had purchased was unusable. BACS received numerous communications from its customers—primarily schools—complaining about this unexplained interruption in service in the middle of a school day. Actions

8

like this threaten the ability of BACS to maintain these relationships and to obtain new sales relationships.

COPsync's Additional Breaches and Unfair Acts and Practices

39.     COPsync has breached the Contract, as amended, in numerous ways, including by directly selling product into BACS's exclusive territories. For example, in October 2014, COPsync's Chief Executive Officer informed BACS that COPsync was direct marketing to the New York Police Department, Nassau County, New York, and Bergen County, New Jersey—all of which are exclusive territories or agencies of BACS.

40.     COPsync appears to have realized that BACS's efforts have created significant opportunities for the sale of COPsync products nationwide. COPsync is no longer satisfied with BACS having its exclusivity rights; COPsync wants to be able to sell its products nationwide itself.

41.     In December 2014, COPsync asked BACS if BACS would relinquish its exclusive rights to all territories and agencies outside of New England (Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont). COPsync did not offer BACS any consideration for giving up its valuable contractual rights nor did COPsync indicate that it was displeased with BACS's efforts.

42.     BACS declined to modify the Contract, as amended.

43.     Because BACS refused to acquiesce to COPsync's demand, on January 6, 2015, COPsync served BACS with a notice of default under the Contract, as amended. The alleged material breaches had no basis in fact and BACS disputes each of them. Indeed, COPsync admits that some of the alleged breaches date back to 2012, evidencing that COPsync did not consider these alleged breaches material until COPsync wished to terminate the Contract. Some of the

9

alleged breaches were also contrary to verbal agreements among the parties, further evidencing COPsync's bad faith in trying to modify the Contract.

44.     COPsync also notified BACS that COPsync was unilaterally converting all of BACS's exclusive rights into non-exclusive rights (with the exception of the New England states)—in other words, exactly the result COPsync previously acknowledged it needed to negotiate with BACS. COPsync had no basis to assert such a conversion.

45.     COPsync's statement that it was unilaterally terminating BACS's valuable exclusivity rights was clearly a threat designed to improve COPsync's bargaining power in renegotiating exclusivity with BACS and to force financial concessions. COPsync's conduct in disregard of known contractual arrangements and intended to secure benefits to itself is an unfair and deceptive trade practice, as are COPsync's false statements of fact.

46.     In addition, while the parties were corresponding about resolution of COPsync's allegations of default, in accordance with the Contract, BACS requested that COPsync register exclusivity for the National Heritage Academies, a multi-state educational institution. Even though the Contract, as amended, was still in effect, COPsync refused to consider BACS's request "until the pending matters between [the parties] are resolved."

47.     Since around mid-January 2015, COPsync also has refused to deliver products to BACS in response to valid purchase orders, which constitutes further breaches of contract and unfair and deceptive acts and practices.

10

## Count I
### (Breach of Contract—BACS v. COPsync)

48. BACS incorporates by reference the allegations contained in paragraphs 1-47.

49. By its actions, COPsync has materially breached the parties' Contract, by, among other things, refusing to deliver products, refusing to register additional exclusivity, and violating BACS's exclusivity.

50. COPsync's breaches have caused BACS damages.

## Count II
### (Breach of Covenant of Good Faith and Fair Dealing—BACS v. COPsync)

51. BACS incorporates by reference the allegations contained in paragraphs 1-50.

52. The parties' contract includes an implied covenant of good faith and fair dealing, which imposed on COPsync a duty not to act in a way that would have the effect of destroying BACS' right to receive the fruits of the parties' contract. Among other things, and as described above, COPsync's breaches of contract and purported termination of the Contract, as amended, without grounds is destroying BACS's right to receive the fruits of the Contract, as amended.

53. COPsync's breach of the implied covenant of good faith and fair dealing have caused BACS damages.

## Count III
### (Promissory Estoppel—BACS v. COPsync)

54. BACS incorporates the allegations contained in paragraphs 1-53.

55. COPsync made representations or engaged in conduct amounting to a representation intended to induce a course of conduct on the part of BACS. Among other things, COPsync (i) represented to BACS that its products were ready for nationwide use, when, in fact, they are not; and (ii) represented to BACS that COPsync did not want to become a national seller of its products.

11

56.     BACS reasonably relied on COPsync's representations to its detriment.

### Count IV
### (Intentional Misrepresentation—BACS v. COPsync, Woessner, Chaney, and Rapp)

57.     BACS incorporates the allegations contained in paragraphs 1-56.

58.     COPsync, Woessner, Chaney, and Rapp made material misrepresentations to BACS, including without limitation (i) a May 2012 statement made during a conference call by Woessner (located in Texas) to Flanagan (located in Danvers, Massachusetts), that COPsync did not want to, and would not, sell its products outside of Texas; (ii) the August 12, 2012 statement made during a meeting in Los Angeles by Woessner to Flanagan that the COPsync Enterprise product was ready to be deployed for nationwide use; and (iii) statements made in meetings held in Boston in June 2009 by Chaney and Rapp to Flanagan that COPsync Enterprise was ready for nationwide deployment.

59.     These material misrepresentations were made with the intention of inducing BACS to act upon them.

60.     These material misrepresentations were made with knowledge of their falsity. COPsync, Woessner, Chaney, and Rapp also knowingly failed to disclose to BACS material facts that they were under a duty to disclose.

61.     BACS justifiably relied on these material misrepresentations to its detriment.

### Count IV
### (Negligent Misrepresentation—BACS v. COPsync, Woessner, Chaney, and Rapp)

62.     BACS incorporates the allegations contained in paragraphs 1-61.

63.     In the course of their business transactions, COPsync made material misrepresentations to BACS, including without limitation (i) a May 2012 statement made during a conference call by Woessner (located in Texas) to Flanagan (located in Danvers,

12

Massachusetts), that COPsync did not want to, and would not, sell its products outside of Texas; and (ii) the August 12, 2012 statement made during a meeting in Los Angeles by Woessner to Flanagan that the COPsync Enterprise product was ready to be deployed for nationwide use.

64.     COPsync made these material misrepresentations with knowledge of their falsity or with reckless disregard of the actual facts. COPsync also knowingly or recklessly failed to disclose to BACS material facts that COPsync was under a duty to disclose.

65.     COPsync failed to exercise reasonable care or competence in communicating information to BACS.

66.     BACS justifiably relied on COPsync's material misrepresentations to its detriment.

### Count V
### (Interference with Advantageous Business Relations—BACS v. COPsync)

67.     BACS incorporates the allegations contained in paragraphs 1-66.

68.     BACS has business relationships or contemplated contracts of economic benefits with many potential end-users of COPsync's products. COPsync knows about these relationships.

69.     COPsync has interfered with these relationships by, among other things, failing to deliver products in a timely fashion and shutting down the COPsync 911 interface without warning and during peak user times.

70.     BACS has suffered a loss of advantage as a result of COPsync's conduct.

13

### Count VI
### (Violation of G.L. c. 93A—BACS v. COPsync, Woessner, Chaney, and Rapp)

71.   BACS incorporates the allegations contained in paragraphs 1-72.

72.   BACS and COPsync are engaged in trade or commerce.

73.   COPsync committed unfair and deceptive trade practices by, among other things, making misrepresentations and breaching the parties' contract for purposes of improper gain. The circumstances that give rise to COPsync's unfair and deceptive acts occurred primarily and substantially in Massachusetts.

74.   COPsync's unfair and deceptive acts caused BACS damages.

### Count VII
### (Declaratory Judgment)

75.   BACS incorporates the allegations contained in paragraphs 1-74.

76.   An actual case or controversy exists as to whether COPsync has terminated the Contract, or any part thereof, and whether COPsync has a basis in fact to terminate the Contract, or any part thereof.

77.   An actual case or controversy exists as to whether COPsync has terminated BACS's exclusive rights under the Contract, and whether COPsync has a basis in fact to terminate BACS's exclusive rights under the Contract.

78.   The controversies can be resolved, and the uncertainty removed, by the entry of a declaratory judgment.

### Requested Relief

WHEREFORE, BACS requests that the Court:

   1.   award BACS damages in an amount to be determined at trial (plus interest);

   2.   award BACS treble damages, attorneys' fees, and costs pursuant to G.L. c. 93A;

14

3.  enter a declaratory judgment declaring that COPsync has not terminated the Contract, or any part thereof, and declaring that COPsync has no basis in fact to terminate the Contract, or any part thereof;

4.  enter a declaratory judgment declaring that COPsync has not terminated BACS's exclusive rights under the Contract, and declaring that COPsync has no basis in fact to terminate BACS's exclusive rights under the Contract; and

5.  award BACS any further relief that the Court deems just and proper.

### Jury Demand

BACS demands a trial by jury on all issues so triable.

Brandon-COPsync, LLC

By its attorneys,

Cynthia M. Guizzetti (BBO# 653858)
cguizzetti@nutter.com
Joseph T. Toomey (BBO# 682675)
jtoomey@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:   (617) 439-2000
Facsimile:   (617) 310-9000

Dated:  February 12, 2015

2739093.1

15

## VERIFICATION

I, Donald Flanagan, as Chief Executive Officer of Brandon-COPsync, LLC, verify under the penalties of perjury that I have read the foregoing Verified Complaint and all the facts stated therein are true except that, as to those statements made upon information and belief, I am informed and believe they are true.

Dated: February 11, 2015

Donald Flanagan

15

# EXHIBIT A

06/02/2010  13:12   6176950551              BRANDON ASSOCIATES                PAGE  02/09

## AGREEMENT FOR PROFESSIONAL SERVICES
### Between Brandon Associates, LLC and COPsync, Inc.

This Agreement for Professional Services (the "Agreement") is made and entered into as of the 2nd day of June, 2010, by and between Brandon Associates, LLC, a government relations firm, having a business address of 29 Commonwealth Avenue, Boston, MA 02116 ("Brandon"), and COPsync, Inc., a public safety technology company, having an address of 210 F.M. 2673, Canyon Lake, TX 78133 ("COPsync").

### 1. TERMS OF AGREEMENT.

A. Commencement. This Agreement will commence on June 1, 2010.

B. Duration. The term of this Agreement shall be for a period twelve (12) months, ending on June 02, 2011. At the conclusion of this period, the term may be extended by the mutual agreement of both parties.

### 2. SERVICES TO BE PERFORMED.

A. Government Relations and Consulting Services. On behalf of COPsync, Brandon shall facilitate meetings with key state and federal officials, identify and compete for grant funding and government procurement opportunities, and identify and pursue available Requests For Responses and Requests For Proposals in the Territory (as defined below).

B. Sales Services. On behalf of COPsync, Brandon shall work to facilitate the sale of COPsync law enforcement products and services to local, state and federal law enforcement agencies and public safety agencies in the Territory, including presentations and demonstrations of COPsync products and services. Brandon shall also provide training to all purchasing agencies in the Territory, as well as those agencies using COPsync technology on a trial basis with the potential for purchase within the Territory. In sum, Brandon shall provide comprehensive support for all sales efforts with agencies purchasing COPsync products and services through Brandon within the Territory ("Agencies").

C. Tech Support. Brandon must have at least one technical engineer or support staff to handle all Tier I and Tier II support calls from Agencies 24 hrs a day 7 days a week. Brandon must have a dedicated sales force and COPsync trained Service Group staffed to provide implementation services These implementation services will require both hardware and software installation and Brandon should provide account management to all Agencies. A staff including project managers, trainers, and data specialists will need to be available. COPsync will provide its required training to Brandon employees in order for Brandon to conduct all future comprehensive training for Brandon customers. Training will take place at the option of COPsync. Initial Training provided by COPsync outside of the Boston area will be at the expense of COPsync. COPsync shall provide all COPsync required documents. Upon completion of initial training of Brandon personal COPsync will provide required support personnel and technical advice for Brandon's first customer

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc*
*May 28, 2010*

Brandon shall provide all future customer demonstrations without COPsync management or personnel, close opportunities without COPsync involvement, place software Purchase Order with COPsync, handle hardware on their own, work with Agencies on all grants and leasing along with providing comprehensive customer training. The parties may agree that special assistance is warranted and enter into limited additional terms on a case by case basis.

**D. Territory of Responsibility.** For purposes of this Agreement, the "Territory" means the states of Massachusetts, Connecticut, New Hampshire, Vermont, Maine, Rhode Island, New Jersey, and Federal Agencies located in the District of Columbia that Brandon initializes and closes, and such additional agencies that the parties may agree will be provided COPsync products and services who are closed by Brandon.

**E. Continuing Obligations.** In order to continue to receive full commission payments Brandon must be actively engaged in selling COPsync products and have proven the ability to meet the most challenging Agency requirements. Volume commitments will need to be met and a loyal customer base is essential. This support must have at least one Technical Engineer or support staff to handle all Tier 1 and Tier II support calls 24 hrs a day 7 days a week. In the event required services are not provided by Brandon and COPsync has to step in and supply the same any payments due Brandon can be reduced by the amount of the expenses incurred by COPsync to provide services to the end-users and off-set against any funds due Brandon under this Agreement

Additionally Brandon must maintain a dedicated sales force and COPsync trained Service Group staffed to provide implementation services. These implementation services will require both hardware and software installation and Brandon is expected to provide account management to all Agencies. This obligation includes providing 1st and 2nd Tier Support to Agencies. A staff including project managers, trainers, and data specialists will need to be available.

Furthermore, Brandon will provide customer demonstrations without COPsync management or staff being required to attend, close opportunities without COPsync or its management or staff involvement, place software purchase orders with COPsync, handle hardware on their own, work with Agencies on all grants and leasing, along with providing comprehensive customer training.

An event highlighting the addition of COPsync software will be necessary and quarterly sales and marketing meeting for sales forecasting will be required.

## 3. COMPENSATION AND RELATED MATTERS.

**A. Compensation for Government Relations and Consulting Services.**

i) **Terms of Compensation.** As consideration for its services, Brandon shall be entitled to a retainer payment in the amount of thirty thousand dollars ($30,000) per month for a period of one (1) year beginning May 28, 2010. Said payments by COPsync are contingent upon receipt by COPsync of investments that COPsync is able to secure, with the assistance of Brandon, for that purpose, up to an amount of three hundred and sixty thousand dollars ($360,000.00) for the initial term of this Agreement.

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc.*
*May 28, 2010*

ii) **Terms of Payment.** Retainer payments will be due at the first of each month, starting June 1, 2010, provided that the funds to make such payments referenced above have been received by COPsync. Late payments received after the 10th calendar day of the month shall accrue late fees of 1% per month until paid.

### B. Compensation for Sales.

i) **Commission Percentage.** In addition to the monthly retainer payments, Brandon will be entitled to a commission equal to amounts actually received by COPsync from Agencies in the Territory in excess of $49.95 per user per month generated from any contract secured as a result of Brandon's efforts on COPsync's behalf. This includes, but is not limited to, those contracts procured as the result of direct marketing and sales efforts conducted by Brandon on behalf of COPsync in conjunction with this Agreement.

ii) **Payment.** Commission payments will be due upon receipt by COPsync from the applicable end-user, payable by the 10th day of following calendar month.

iii) **Contact List.** On a monthly basis, Brandon will provide to COPsync a dated contact list detailing the name of each Agency contacted, address, telephone numbers, email addresses, contact names, number of full-time, part-time, reserve officer licenses available in the agency, and a summary of each meeting or demonstration conducted. This list provided will include a proposed closing date for each contact, based on their internal discussions with the listed agency.

iv) **Duration.** Brandon shall be entitled to the above-defined commission for the full term of this Agreement regardless of whether or not the relationship created in this Agreement is still in existence, has run its course, or has been terminated, provided Brandon continues to provide service to end-user Agencies as described in Section 2 of this Agreement. Brandon shall also be entitled to commission on all subsequent contract renewals, extensions and/or new purchases that are procured by COPsync as the result of business-to-business contractual relationships consummated by Brandon on behalf of COPsync during the term of this Agreement, regardless of whether or not the relationship created in this Agreement is still in existence, has run its course, or has been terminated; provided Brandon continues to provide service to end-user Agencies as described in Section 2 of this Agreement. To the extent Brandon discontinues to provide service to Agencies during the term of this Agreement, commission payments to Brandon for amounts received by COPsync from such Agencies will be reduced by the amount of expenses incurred by COPsync to provide such services to the Agencies.

C. **Expenses.** Remaining monthly payments will include the reimbursement of reasonable directly related expenses incurred outside the Territory by Brandon during the immediately preceding month, inclusive of travel and associated expenses, as required to carry out the services described in Section 2 of this Agreement. Brandon will exercise every effort to minimize expenses incurred on behalf of COPsync and will receive prior written approval from COPsync for all such expenses. COPsync will have no obligation to reimburse Brandon for expenses incurred by Brandon within their Territory, as territorial expenses are covered by the monthly retainer.

D. **Training.** In order to continue to receive commission payments as provided herein Brandon agrees to complete sales and technical training and demonstrate exceptional business performance, measured by revenue, support and training goals.

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc*
*May 28, 2010*

**4. TERMINATION.** Either party may terminate this Agreement by written notice if there has been a material breach hereof by the other party, which has not been cured within ten (10) days after the date of written notice of material breach to the breaching party by the non-breaching party. Liability shall be limited to those services and expenses rendered or incurred as of the notice date, or services yet to be performed in the event that such services have been prepaid. Any payments due Brandon during the breach period prior to correction will be reduced by the amount of the expenses incurred by COPsync to provide such services to the end-users and off-set against any funds due Brandon under this Agreement.

**5. NOTICES.** Any notice given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given when delivered either personally or by a nationally recognized overnight courier, or by United States certified or registered mail, return receipt requested, postage prepaid, addresses as follows:

If to COPsync:

Russell Chaney
CEO
COPsync, Inc.
2010 F.M. 2673
Canyon Lake, TX 78133

If to the Brandon:

Donald Flanagan
President & CEO
Brandon Associates, LLC
29 Commonwealth Ave.
Boston, MA 02116

**5. MISCELLANEOUS.**

**A. Ownership and Confidentiality.** The work product, documents, information and intellectual property generated by Brandon hereunder are the property of COPsync. All information provided by COPsync hereunder will be treated as strictly confidential, and will not be shared with any person other than employees of COPsync or Brandon.

**B. Indemnification.** The parties agree to indemnify and hold harmless each other against any and all liability, claims, suits, losses, costs and legal fees arising from the conduct of the other under this Agreement, other than claims arising from a party's willful misconduct or gross negligence.

**C. Assignment.** Neither COPsync nor Brandon shall assign any interests in this Agreement without the written consent of the other party.

**D. Successors in Interest.** This Agreement shall bind and inure to the benefit of Brandon and any successor of Brandon whether by reorganization, merger, consolidation, liquidation, sale or other assignee of Brandon's business or assets

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc*
*May 28, 2010*

E. Severability. If any provision of this Agreement is held unenforceable or declared invalid by a court of competent jurisdiction, then such provision will be modified to reflect the parties' intention and shall be ineffective only to the extent of such invalidity. All remaining provisions of this Agreement shall remain in full force and effect.

F. Effect of Waiver. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

G. Choice of Law and Forum. This Agreement shall be interpreted under the laws of the State of Texas. Any dispute between the parties must first be attempted to be resolved by mediation in Travis County, Texas. If either party seeks an injunction citing irreparable harm and exigency of the circumstances relief under this Agreement shall be sought from the trial courts of Comal County, Texas. .

H. Entire Agreement. This Agreement encompasses the entire agreement of the parties relative to the above described professional services, and supersedes all previous understandings and agreements between the parties, whether oral or written. *This Agreement may only be amended by a written document duly executed by all parties.*

I. Prior Agreements. The parties agree that this Agreement supersedes any and all prior agreements which are hereby terminated.

J. Definitions Tiers (1) (2) (3):

Tier (1)-Top 15 law enforcement agencies
Tier (2)- Top 16-40 law enforcement agencies
Tier (3) - Top 41-60 law enforcement agencies

EXECUTED as a sealed instrument as of the date first written above.

COPSYNC, INC.

BY: _____
Printed Name: Russell D. Chaney
Date: _____

BRANDON ASSOCIATES, LLC

BY: _____
Printed Name: Donald B. Flanagan
Date: ____4/2/10____

*Agreement for Professional Services between Brandon Associates, LLC and COPsync, Inc.*
*May 28, 2010*

06/02/2010  13:12    6176950551              BRANDON ASSOCIATES              PAGE  09/09

such legal action shall be entitled to recover all court costs, reasonable attorney fees, and costs of enforcing or collecting any judgment awarded.

The signatures below shall bind Brandon and COPsync to the terms and conditions of this Agreement. Furthermore, both parties understand, agree and accept the above terms and conditions of this Agreement.

BRANDON ASSOCIATES, LLC

Signature: _____

Title: President / CEO

Address: 29 Commonwealth Ave

City, State, Zip: Boston, MA 02116

Date: 6/2/10

COPSYNC, INC

Signature: _____

Title: CEO

Address: 2010 F.M. 2673

City, State, Zip: Canyon Lake, TX 78133

Date: 6-7-2010

*Referral Compensation Agreement between Brandon Associates, LLC and COPsync, Inc. May 6, 2010*

## REFERRAL COMPENSATION AGREEMENT

The following represents an agreement (the "Agreement") between Brandon Associates, LLC (hereinafter "Brandon") and COPsync, Inc. (hereinafter "COPsync") in consideration of each other's promises or acts. This Agreement is entered into on May 28, 2010. Pursuant to this Agreement, Brandon has and/or will facilitate meetings and introductions on behalf of COPsync with "Listed Potential Investors" in return for COPsync's agreement to pay Brandon compensation for these introductory services if an investment, either directly or indirectly, results as a consequence of these services.

The Parties agree as follows:

### 1. DEFINITIONS.

A. Listed Potential Investors. As used herein, "Listed Potential Investors" means entities introduced or referred by Brandon to COPsync. The initial Listed Potential Investors are listed on Exhibit A attached hereto, and additional Listed Potential Investors that may be added to such Exhibit A by submission by Brandon, with COPsync's consent, which consent will not be unreasonably withheld. Listed Potential Investors shall also include those Listed Potential Investor's affiliates and co-investors procured through such Listed Potential Investor .

### 2. TERMS.

A. Initial Investment. Should a Listed Potential Investor directly or indirectly invest monies, properties, patents (or anything of value) into COPsync and or a COPsync – affiliated project (all are defined as "COPsync"), regardless of the form in which such proceeds are invested within one (1) year after the date of this Agreement, COPsync agrees to pay to Brandon as compensation under this Agreement, unless a different arrangement is agreed upon in writing, in advance, on a case-by-case basis, a "finder's fee" of FIVE PERCENT (5%) of the proceeds (or value) so invested in COPsync. This compensation shall be based upon the gross amount invested in COPsync, prior to any deductions, expenses, or offsets of any kind, and shall be paid within TEN (10) DAYS following COPsync's receipt of funds (or value). Notwithstanding the foregoing, Brandon will not be entitled to any compensation under this Agreement for any investment in COPsync that is used by COPsync to pay Brandon the retainer required under that certain Agreement for Professional Services, of even date herewith, by and between COPsync and Brandon.

B. Limitation of Services. This Agreement relates solely to Brandon's services rendered in providing COPsync with the Listed Potential Investors and facilitating introductions and meetings with these investors. Brandon is requested to perform no additional services to be entitled to the above compensation in the event that an investment is made. Neither COPsync nor any of its advisors shall directly or indirectly state in any communications, written or oral, with the Listed Potential Investors that Brandon recommends the purchase of any securities. Moreover, Brandon shall not (i) have any contact with any of the Listed Potential Investors with respect to COPsync or the offering of any securities, (ii) advise COPsync or any of its advisors on the terms of any securities, the offering of any securities or the documents relating to the offering of the securities, (iii) provide COPsync or any of the Listed Potential Investors any information in connection with the offering of the securities, (iv) negotiate with either COPsync or any of the Listed Potential Investors with respect to the securities, (v) assist any of the Listed

*Referral Compensation Agreement between Brandon Associates, LLC and COPsync, Inc. May 6, 2010*

Potential Investors in reviewing or completing any of the documents relating to the offering of the securities, or (vi) receive or otherwise handle any of the securities sold to any of the Listed Potential Investors or the funds that any of the Listed Potential Investors deliver in payment for any securities.

*Additionally, Brandon is not (i) a registered "broker" ("Broker") or "dealer" ("Dealer") as such terms are defined in Section 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or (ii) an investment adviser ("Investment Advisor"), as such term is defined in Section 202(a)(11) of the Investment Advisors Act of 1940, as amended, or comparable state laws, and will not act to effect any transactions in securities for the account of COPsync. With respect thereto and notwithstanding anything set forth herein to the contrary, in connection with the offering of securities, Brandon shall not carry out any activity or function that (i) may be traditionally performed by or otherwise be deemed to include those of a Broker, Dealer or Investment Adviser or (ii) would require Brandon to register itself as a Broker, Dealer, or Investment Advisor. Payments of fees hereunder will be made only in compliance with the respective federal and state security laws, and adjustments and amendments to agreements will be made accordingly. Brandon agrees, if necessary, to register as "finder" or "introducer" in any states requiring it to do so. Brandon acknowledges that COPsync, in its sole discretion, may decline to complete any investment with a Listed Potential Investor for any reason, including, but not limited to, COPsync's determination of the absence of exemptions under applicable securities laws for such investment due to compensation payable to Brandon hereunder.*

E. Miscellaneous.

    1)    <u>Successors and Assigns</u>. This Agreement shall be binding upon all parties and their respective estates, heirs, successors, and permitted assigns.

    2)    <u>Alterations</u>. This Agreement may be changed only by the written consent of all parties.

    3)    <u>Assignment</u>. Neither COPsync nor Brandon shall assign any interests in this contract without the written consent of the other party.

    4)    <u>Integration</u>. This Agreement is the entire agreement between COPsync and Brandon regarding the subject matter hereof. There are no understandings, representation, or warranties between the parties concerning this Agreement except as set forth in this Agreement

    5)    <u>Severability</u>. The judgment by any court of law that a particular section of this Agreement is illegal shall not affect the validity of the remaining provisions.

    6)    <u>Governing Law</u>. It is our intention that this Agreement shall be interpreted under the laws of the State of Texas. Any litigation under this Agreement shall be resolved in the trial courts of Comal County, Texas.

    7)    <u>Attorneys' Fees and Costs</u>. Should any legal proceeding be necessary to construe or enforce the provisions of this Agreement, the prevailing party in

*Referral Compensation Agreement between Brandon Associates, LLC and COPsync, Inc. May 6, 2010*

# EXHIBIT B

**FIRST AMENDMENT
TO THE
AGREEMENT FOR PROFESSIONAL SERVICES**

This First Amendment to the Agreement for Professional Services is made as of the 30th day of September, 2012 by and between Brandon Associates LLC, Brandon-COPsync, LLC (hereinafter collectively "Brandon"), with a principal place of business located at 29 Commonwealth Avenue, Suite 901 Boston, Massachusetts, 02116 and COPsync, Inc. (hereinafter "COPsync") with a principal place of business located at to 5001 Spring Valley Road, Suite 825W, Dallas, Texas, 75244-8225 (each a "Party" and collectively "the Parties").

WHEREAS, Brandon and COPsync have been operating under an Agreement for Professional Services and a Trademark License Agreement (collectively the "Agreement for Services") dated June 2, 2010 authorizing Brandon to re-license/re-sell COPsync's products and services to end users; and

WHEREAS, the parties' business relationship has grown and changed and they anticipate continued growth, and the Parties have determined that it is in their best mutual interests to amend the Agreement for Services; and

WHEREAS, the parties agree that the Brandon mission is to focus on National Distribution of the COPsync products, including a) Reselling COPsync products based on geographic and opportunity defined territories, b) Recruiting Top-tier Federal, State and Local agencies as COPsync users and reference accounts, c) Recruiting Top-tier System Integrators and Prime Contractors as Brandon-COPsync resellers, and d) Recruiting Top-tier Resellers with National Distribution Channels as Brandon-COPsync resellers.

NOW THEREFORE, Brandon and COPsync, in consideration of the mutual promises made in this Amendment and for other good and valuable consideration, have agreed to amend the Agreement for Services as set forth below. Except as explicitly modified by this Amendment, the Agreement for Services shall otherwise remain unchanged and in full force and effect. As used herein, the term "Agreement for Services" includes the provisions of this First Amendment.

1.   Assignment. All rights and responsibilities of Brandon Associates, LLC pursuant to the Agreement for Services are hereby assigned to and assumed by Brandon-COPsync, LLC.

2.   Duration.

2.1   The Term as defined in Paragraph 1B of the Agreement for Services is extended for a period of five (5) years through September 30, 2017. The Term shall thereafter be deemed to renew annually provided that neither Party is in material breach of the Agreement or has given written notice to the other at least 90 days prior to the expiration of the then Term that such Party does not desire to renew.

2.2   Notwithstanding the above, in the event of termination or expiration of the Agreement for Services, Brandon shall be entitled to receive its percentage share of the gross revenue of any sale or license of COPsync's services or product to an end-user agency or customer for which Brandon is directly responsible, or for any sale or license to an agency or customer by a Third Party Partner (defined below) that was registered with COPsync by



1

Brandon. Brandon shall be entitled to its share of such Gross Revenue (defined below) so long as such end-user agency or customer uses the COPsync service or product and so long as Brandon continues to fulfill its contractual obligations to that customer, whether arising under the customer end-user agreement, the Agreement for Services, or otherwise, and such sharing shall be reinstated if a customer reengages after termination or the lapse of its end-user license agreement.

2.3    Gross Revenue shall be defined as the total revenue, whether one-time or recurring, derived from a sale or license of COPsync's services and products, before the deduction of any fee split, fee sharing or commission to any Party, including a Third Party Partner.

3.    <u>Territory.</u>

3.1    Brandon shall have the exclusive right to market, sell and license COPsync's services and products in the Geographic Territory as described in Section 2D of the Agreement for Services, and shall have the exclusive right to market, sell and license the COPsync services and products in any additional territory or through any Third Party Partner or to any specific Agency or Customer for whom it is granted exclusivity as provided herein. As of the date of the First Amendment, the geographical locations, Third Party Partners and specific agencies and customers shown on Exhibit A have been registered with COPsync and, consequently, are included within the Territory, as an Agency or as a Third Party Partner. As new Territories, Agencies and Third Party Partners are registered, Exhibit A will be deemed updated and incorporated into the Agreement for Services.

3.1.1    Regarding additional Geographic Territories, Brandon shall request registration of exclusivity for additional geographically defined territories on the basis of a) establishing a Brandon sales presence within reasonable proximity to the territory (e.g., a specific State or grouping of States), and Brandon will identify to COPsync the designated sales resource assigned to the territory. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant. Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated.

3.1.2    Regarding registration of additional Agencies, Brandon shall request registration of exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant. Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated.

3.1.3    Regarding registration of additional Multi-agency Territories, Brandon shall request registration of exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant. Unless otherwise determined by COPsync in the

2



FAN

exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated. An example of a Multi-agency Territory includes, but is not limited to, Brandon's exclusive right to market and sell to all agencies within Los Angeles County, California.

3.1.4   Regarding registration of additional Multi-territorial Agencies, Brandon shall request registration of exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant.   Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated. For the purposes of the Agreement for Services, Multi-territorial Agency means a single Agency that operates throughout more than one geographic area, such as the Federal Bureau of Investigation.

3.2   Upon grant and registration of the exclusivity, Brandon shall be subject to the terms and conditions of the exclusivity grant, if any imposed by COPsync pursuant to the registration standards established by this Agreement, and have the exclusive right to market, sell and license COPsync services and products in the additional Geographic Territory or to the additional Agency, Federal Agency, Multi-agency Territory, Multi-territorial Agency, or via Third Party Partner, as the case may be, as though it were an agency or partner within a defined Territory as those listed in Section 2D of the Agreement for Services or EXHIBIT A of this First Amendment. For the purposes of the Agreement for Services, Third-party Partner shall mean a Partner that operates throughout more than one geographic area, such as Raytheon Company.

3.2.1   Possible channel conflicts with other COPsync partners on specific opportunities in specific geographic territories will be identified by Brandon and COPsync, and an equitable work-around mutually negotiated on a case-by-case basis. Brandon is prepared to support multiple Prime Contractors on specific competitive opportunities.

3.2.2   With regard to the registration of exclusivity process, Brandon understands that COPsync will from time-to-time in the exercise of its sole discretion, appoint distributors/resellers for territories/customers (or specifically retain for itself territories/customers) that have not been granted exclusively to Brandon. COPsync shall promptly notify Brandon of the grant of exclusivities to other persons or territories/customers specifically retained for COPsync so that channel conflict can be avoided.

3.3   COPsync agrees to refer to Brandon all contacts from Territories, additional Geographic Territories, additional Agencies, Multi-agency Territories, Multi-territorial Agencies, federal agencies, and Third Party Partners for which Brandon has been granted exclusivity as provided herein. Likewise, Brandon agrees to do the same with respect to those territories or customers for whom COPsync has retained or assigned the exclusive sales and marketing rights, assuming that Brandon has been notified of the same as provided in paragraph 3.2.2. Additionally, COPsync may from time-to-time forward to Brandon sales contacts from unregistered and unreserved territories and customers; Brandon will be granted first opportunity to immediately engage with these customers for the purpose qualifying such leads and pursuing sales activities, and failure to do so will



3



cause the lead to revert to COPsync for reassignment or reservation to COPsync. Also, if requested by COPsync, Brandon may from time-to-time agree to support any sales efforts to top-tier Agencies or opportunities (e.g., Brandon leading Request For Proposal (RFP) response efforts) that have not been exclusively assigned to Brandon. In these circumstances, Brandon and COPsync shall negotiate reasonably and in good faith with the objective of providing for an equitable division of resulting revenue as and if applicable to the situation. Also, the grant of exclusivity herein shall not prevent COPsync from working as a vendor or subcontractor to other persons with respect to RFP response efforts, except as such would violate the grant of exclusivity to Brandon per the terms of this Agreement Additionally, COPsync and Brandon acknowledge that there may be RFP situations where Brandon is not in a position to bid COPsync and because of Brandon's exclusivity, COPsync would thereby be locked out of bidding the RFP. In those situations, Brandon and COPsync shall negotiate reasonably and in good faith with the objective of the negotiation being to allow COPsync to submit an RFP response while providing for an equitable division of resulting revenue as and if applicable to the situation.

4.   Certain Provisions Applicable to Third Party Partners / Value Added Resellers.

4.1   Brandon shall have the exclusive right to re-sell COPsync Products through Third Party Partners for whom exclusivity has been granted as provided in this Agreement. As of the date hereof, the Raytheon Company and its corporate affiliates, including, but not limited to, Raytheon JPS (collectively, "Raytheon Company"), has previously been identified and registered by Brandon as a Third Party Partner. With respect to Raytheon Company in particular, all gross revenue derived from the sale or license of COPsync's products and services, less Raytheon's 30% commission (this is an estimate of their maximum commission which shall be subject to COPsync reasonable review and approval), shall be divided evenly between COPsync and Brandon, e.g., at an effective rate of 35% of gross revenue each.

4.1.1   Apart from those categories specifically addressed in this Amendment, it is recognized that for specific opportunities and / or partnering arrangements, alternative division of revenue may be negotiated on a case-by-case basis (e.g., based on a non-standard division of service labor between Brandon, COPsync, and the Third Party).

4.2   Regarding registration of additional Third Party Partners, Brandon shall request exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of such grant. Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated. After registration, Brandon and COPsync shall negotiate in good faith to determine on a case-by-case basis the Parties' respective share of the resulting Gross Revenues for any sale or license by the Third Party Partner of COPsync's services or products.

4.3   It is anticipated that Third Party Partners may require a separate contract between Brandon, COPsync and the Partner, in which event Brandon and COPsync agree to



4

cooperate and negotiate in good faith in the drafting and execution of such contracts provided they reflect the minimum economic terms agreed to in this Agreement.

5.    Certain Provisions Applicable to Agency Licensing.

5.1   Brandon may market, license and sell COPsync's products and services, either directly or with a Third Party Partner, to large agencies at a discounted rate and without the prior written approval of COPsync so long as such discounts comply with the following pricing structure:

- 1-99 Employees (defined as Sworn, Reserve and Admin/Clerical):   Monthly license fee of $60.00 per employee (no greater than 40% discount from current individual user license pricing).

- 100-500 Employees:   Monthly license fee of $45.00 per employee (no greater than 55% discount from current individual user licensing pricing).

- 500+ Employees:   Monthly license fee of $30.00 per employee (no greater than 70% discount from current individual user licensing pricing).

5.2   Brandon is authorized to sell or license COPsync's products and services to large agencies and enterprises at rates in excess of the above pricing structure, without the prior written approval of COPsync.

5.3   Brandon may sell or license COPsync's products and services to large agencies at rates lower than the above-pricing structure only with the prior written approval of COPsync. In such event, Brandon and COPsync shall negotiate in good faith to come to an agreement on any further discounts of COPsync's products and services. From time to time, Brandon may propose pricing to an agency of any size, either directly or via a third party, that is lower than the above pricing structure for strategic reasons (e.g., an early adopter or lead agency in a state or region, or a prospective distributor / reseller partner), or to provide such with a limited number of "demonstration licenses" at no charge, and Brandon will first obtain COPsync approval, with the understanding that whatever resulting revenue will be split evenly.

5.4   All revenue from the sale or license of COPsync's products and services based on the above price structure (less any Third Party Partner share if applicable) shall be split evenly between Brandon and COPsync, unless otherwise mutually agreed in writing in advance of the sale or license.

5.5   Certain Provisions Applicable to Federal Agencies.   With respect to the Federal Bureau of Investigation and the Secret Service, Brandon shall have the exclusive right to market, sell and license the COPsync's services and products to these federal agencies as described in Section 2D of the Agreement for Services.

Regarding registration of additional federal agencies, Brandon shall request exclusivity once initialized via Brandon sales contact and continuing work product. COPsync shall determine in the exercise of its reasonable discretion, not to be unreasonably withheld whether or not to grant the requested exclusivity and if so the terms and conditions of

5



such grant.    Unless otherwise determined by COPsync in the exercise of its reasonable discretion, such exclusivity shall persist for 36 months, and shall automatically be extended as work progress is demonstrated.

With respect to the Department of Homeland Security and Customs and Border Protection, Brandon shall have the right to market, sell and license the COPsync services and products to these federal agencies. It is specifically contemplated that COPsync shall also be marketing, selling and licensing COPsync's services and products to these federal agencies at the state and local level. COPsync shall also have the right to market, sell and license the COPsync's services and products to these agencies at the federal level; however, COPsync shall not initiate any such activities at the federal level without first discussing the situation with Brandon with the objective of the discussion to be eliminating or mitigating any channel, sales, messaging or other conflicts, and negotiating an equitable division of resulting revenue as and if applicable to the situation.

6.    Additional Services.

6.1    COPsync may offer products or services in addition to the COPsync information sharing, communication and data interoperability network, including, but not limited to, products in development such as "WARRANTsync" and "VIDTAC."

6.2    The parties shall negotiate in good faith for the authorization of Brandon to market, license and sell WARRANTsync at such time, if any, that COPsync makes WARRANTsync generally available to COPsync's reseller network.    Brandon may decline, at its sole discretion, marketing, licensing and selling WARRANTsync.

6.3    Brandon is hereby authorized, but is not obligated, to market, license and sell VIDTAC under the Agreement for Services.   The parties shall at a future date negotiate in good faith the terms and conditions between COPsync and Brandon for the marketing, licensing and sale of VIDTAC at such time as COPsync determines its own terms and conditions relating to offering VIDTAC to COPsync's reseller network.

7.    Technical Support. In the event that Brandon enters into a Third Party Partner contract in which technical support and training are contracted away to the Third Party Partner, then COPsync and Brandon shall be relieved of those obligations as otherwise would be required under the Agreement for Services.

8.    Miscellaneous.

8.1    Paragraphs 3A (i) and (ii) regarding COPsync's compensation to Brandon Associates for Government Relations and Consulting Services are deleted with all such payments having already been fully made by COPsync.

8.2    Paragraph 3B (ii) is hereby amended in its entirety to read as follows:

> ii) Payment. Upon receipt by either party of the monthly or annual license fee from an applicable end-user, any payments or Gross Revenue sharing due to the other party shall be payable by the end of the following calendar month.



8.3     Paragraph 3B (iii) is hereby deleted.

8.4     Paragraph 3C regarding COPsync payment of Brandon Associates expenses is hereby deleted.

8.5     Paragraph 5 is hereby amended by adding the following:   "A party may change its address for notice under this Agreement by providing written notice to the other party in the manner stated above."

COPsync hereby provides notice that its address for notices is changed to 5001 Spring Valley Road, Suite 825W, Dallas, Texas 75244-8225.

8.6.    Paragraph 5D is hereby amended in its entirety to read as follows:

> **D. Successors in Interest.** This Agreement shall bind and inure to the benefit of Brandon and COPsync and their respective successors-in-interest   whether   by   reorganization,   merger, consolidation, liquidation, sale or other assignee of their business or assets.

8.7     Paragraph 5G is hereby amended to substitute "Dallas County" for "Travis County" and "Comal County."

In witness whereof the Parties have executed this First Amendment as of the date set forth above.

COPSYNC, INC

By: Ronald A. Woessner, CEO

BRANDON ASSOCIATES, LLC
BRANDON-COPSYNC, LLC

By: Donald B. Flanagan, Manager

7

## EXHIBIT A

### REGISTERED TERRITORIES, AGENCIES and THIRD PARTY PARTNERS

#### Registered Territories

1. Massachusetts;
2. Connecticut;
3. New Hampshire;
4. Vermont;
5. Maine;
6. Rhode Island; and
7. New Jersey.

#### Registered Additional Geographies

8. Los Angeles County, California;
9. New York State, including the New York Police Department;
10. Dayton, Ohio

#### Registered Federal Agencies

11.
   a. Federal Bureau of Investigation
   b. Department of Homeland Security
   c. Customs and Border Protection
   d. Secret Service

#### Registered Third Party Partners

12. The Raytheon Company.

8

# Exhibit C

| **CIVIL ACTION COVER SHEET** | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT COUNTY OF   ESSEX | DOCKET NO. _____ |
|---|---|---|

| PLAINTIFF(S) **Brandon-COPsync, LLC** | DEFENDANT(S) **COPsync, Inc., Ronald A. Woessner, Russell D. Chaney, and J. Shane Rapp** |
|---|---|

| Plaintiff Atty | Cynthia Guizzetti, Nutter McClennen & Fish LLP | Type Defendant's Attorney Name |
|---|---|---|
| Address | Seaport West, 155 Seaport Boulevard | Defendant Atty | |
| | | Address | |
| City | Boston    State MA   Zip Code 02210 | City |     State     Zip Code |
| Tel. | +1 (617) 439-2000    BBO# 653,858 | |

**TYPE OF ACTION AND TRACK DESIGNATION** (See reverse side)

CODE NO.         TYPE OF ACTION (specify)       TRACK         IS THIS A JURY CASE?

**B99 Other Tort (specify) - Fast Track**                  ☉ ] Yes  ⊙ ] No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

A.   Documented medical expenses to date:
1.   Total hospital expenses                                        $_____
2.   Total doctor expenses                                          $_____
3.   Total chiropractic expenses                                    $_____
4.   Total physical therapy expenses                                $_____
5.   Total other expenses (describe)                                $_____
                                                      Subtotal      $_____

B.   Documented lost wages and compensation to date                 $_____
C.   Documented property damages to date                            $_____
D.   Reasonably anticipated future medical expenses                 $_____
E.   Reasonably anticipated lost wages and compensation to date     $_____
F.   Other documented items of damages (describe)                   $_____

G.   Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                                      Total $_____

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):

See attached description of tort and contract claims          TOTAL   $..............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

AI hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods.

Signature of Attorney of Record _____          Date: 2/12/15

A.O.S.C. 3-2007

## CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### * CONTRACTS

| | | |
|---|---|---|
| A01 | Services, Labor and Materials | F) |
| A02 | Goods Sold and Delivered | (F) |
| A03 | Commercial Paper | (F) |
| A08 | Sale or Lease of Real Estate | (F) |
| A12 | Construction Dispute | (A) |
| A99 | Other (Specify) | (F) |
| E03 | Claims against Commonwealth or Municipality | (A) |

**\*TORT**

| | | |
|---|---|---|
| B03 | Motor Vehicle Negligence personal injury/property damage | (F) |
| B04 | Other Negligence- personal injury/property damage | (F) |
| B05 | Products Liability | (A) |
| B06 | Malpractice-Medical | (A) |
| B07 | Malpractice-Other (Specify) | (A) |
| B08 | Wrongful Death, G.L. c.229, s.2A | (A) |
| B15 | Defamation (Libel-Slander) | (A) |
| B19 | Asbestos | (A) |
| B20 | Personal Injury- slip & fall | (F) |
| B21 | Environmental | (F) |
| B22 | Employment Discrimination | (F) |
| B99 | Other (Specify) | (F) |
| E03 | Claims against Commonwealth | (A) |

### * REAL PROPERTY

| | | |
|---|---|---|
| C01 | Land Taking (eminent domain) | (F) |
| C02 | Zoning Appeal, G.L. c.40A | (F) |
| C03 | Dispute concerning title | (F) |
| C04 | Foreclosure of mortgage | (X) |
| C05 | Condominium Lien & Charges | (X) |
| C99 | Other (Specify) | (F) |
| E03 | Claims against Commonwealth or Municipality | (A) |

**EQUITABLE REMEDIES**

| | | |
|---|---|---|
| D01 | Specific Performance of Contract | (A) |
| D02 | Reach and Apply | (F) |
| D06 | Contribution or Indemnification | (F) |
| D07 | Imposition of a Trust | (A) |
| D08 | Minority Stockholder's Suit | (A) |
| D10 | Accounting | (A) |
| D12 | Dissolution of Partnership | (F) |
| D13 | Declaratory Judgment G.L. c. 231A | (A) |
| D99 | Other (Specify) | (F) |

### MISCELLANEOUS

| | | |
|---|---|---|
| E02 | Appeal from Administrative Agency G.L. c. 30A | (X) |
| E03 | Claims against Commonwealth or Municipality | (A) |
| E05 | Confirmation of Arbitration Awards | (X) |
| E07 | G.L. c.112, s.12S (Mary Moe) | (X) |
| E08 | Appointment of Receiver | (X) |
| E09 | General Contractor bond, G.L. c. 149, ss. 29, 29a | (A) |
| E11 | Workers Compensation | (X) |
| E12 | G.L.c.123A, s.12 (SDP Commitment) | (X) |
| E14 | G.L. c. 123A, s. 9 (SDP Petition) | |
| E15 | Abuse Petition, G. L. c. 209A | (X) |
| E16 | Auto Surcharge Appeal | (X) |
| E17 | Civil Rights Act, G.L. c.12, s. 11H | (A) |
| E18 | Foreign Discovery Proceeding | (X) |
| E19 | Sex Offender Registry G.L. c. 178M, s. 6 | (X) |
| E21 | Protection from Harassment c 258E | (X) |
| E25 | Plural Registry (Asbestos cases) | |
| E94 | Forfeiture G.L. c.265 s.56 | (X) |
| E95 | \*\*Forfeiture G.L. c. 94C, s. 47 | (F) |
| E96 | Prisoner Cases | (F) |
| E97 | Prisoner Habeas Corpus | (X) |
| E99 | Other (Specify) | (X) |

**\*Claims against the Commonwealth or a municipality are type E03, Average Track, cases.**
**\*\*Claims filed by the Commonwealth pursuant to G L c 94C, s 47 Forfeiture cases are type E95, Fast track.**

TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | [ X ] Yes    [  ] |

### SUPERIOR COURT RULE 29

DUTY OF THE PLAINTIFF. The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5)(C).

DUTY OF THE DEFENDANT. Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

### A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

### FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN DISMISSAL OF THIS ACTION.

Attachment To Civil Action Cover Sheet

Brandon-COPsync, LLC v. COPsync, Inc. et al.

Tort Claims

**G. Brief Description of plaintiff's injury, including nature and extent of injury**

Defendant, a business partner of Plaintiff, made misrepresentations to Plaintiff and committed unfair and deceptive trade practices.

Total: tbd

Contract Claims

The acts described above were in violation of Defendant's Contact with Plaintiff.

Total: tbd

2739920.1

# <u>Exhibit D</u>

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS<br>SUPERIOR COURT DEPARTMENT<br>COUNTY OF   ESSEX | DOCKET NO.   1577CV00212 |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| **Brandon-COPsync, LLC** | **COPsync, Inc., Ronald Woessner,<br>Russell D. Chaney, and J. Shane Rapp** |

| | | |
|---|---|---|
| Plaintiff Atty | Cynthia Guizzetti, Nutter McClennen & Fish LLP | Type Defendant's Attorney Name |
| Address | Seaport West, 155 Seaport Boulevard | Defendant Atty |
| | | Address |
| City | Boston     State MA   Zip Code 02210 | City          State    Zip Code |
| Tel. | +1 (617) 439-2000      BBO#   653,858 | |

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify)   TRACK | IS THIS A JURY CASE? |
|---|---|---|
| **B99 Other Tort (specify) - Fast Track** | | ⦿ ] Yes   ⦶ ] No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

## TORT CLAIMS
### (Attach additional sheets as necessary)

A.   Documented medical expenses to date:
   1.   Total hospital expenses                                                                      $ _____
   2.   Total doctor expenses                                                                        $ _____
   3.   Total chiropractic expenses                                                               $ _____
   4.   Total physical therapy expenses                                                        $ _____
   5.   Total other expenses (describe)                                                         $ _____
                                         Subtotal   $ _____
B.   Documented lost wages and compensation to date                                  $ _____
C.   Documented property damages to date                                                   $ _____
D.   Reasonably anticipated future medical expenses                                     $ _____
E.   Reasonably anticipated lost wages and compensation to date                 $ _____
F.   Other documented items of damages (describe)
                                                   $ _____
G.   Brief description of plaintiff=s injury, including nature and extent of injury (describe)

Total $ 4,000,000.00

## CONTRACT CLAIMS
### (Attach additional sheets as necessary)
Provide a detailed description of claim(s):

| | |
|---|---|
| See attached description of tort and contract claims. | TOTAL      $.500,000 |

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

AI hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods.@
Signature of Attorney of Record _____          Date:  4/15/2015
A.O.S.C. 3-2007

## CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### * CONTRACTS

| Code | Description | Track |
|---|---|---|
| A01 | Services, Labor and Materials | F) |
| A02 | Goods Sold and Delivered | (F) |
| A03 | Commercial Paper | (F) |
| A08 | Sale or Lease of Real Estate | (F) |
| A12 | Construction Dispute | (A) |
| A99 | Other (Specify) | (F) |
| E03 | Claims against Commonwealth or Municipality | (A) |

**\*TORT**

| Code | Description | Track |
|---|---|---|
| B03 | Motor Vehicle Negligence personal injury/property damage | (F) |
| B04 | Other Negligence- personal injury/property damage | (F) |
| B05 | Products Liability | (A) |
| B06 | Malpractice-MedicaL | (A) |
| B07 | Malpractice-Other (Specify) | (A) |
| B08 | Wrongful Death, G.L. c.229, s.2A | (A) |
| B15 | Defamation (Libel-Slander) | (A) |
| B19 | Asbestos | (A) |
| B20 | Personal Injury- slip & fall | (F) |
| B21 | Environmental | (F) |
| B22 | Employment Discrimination | (F) |
| B99 | Other (Specify) | (F) |
| E03 | Claims against Commonwealth | (A) |

### * REAL PROPERTY

| Code | Description | Track |
|---|---|---|
| C01 | Land Taking (eminent domain) | (F) |
| C02 | Zoning Appeal, G.L. c.40A | (F) |
| C03 | Dispute concerning title | (F) |
| C04 | Foreclosure of mortgage | (X) |
| C05 | Condominium Lien & Charges | (X) |
| C99 | Other (Specify) | (F) |
| E03 | Claims against Commonwealth or Municipality | (A) |

**EQUITABLE REMEDIES**

| Code | Description | Track |
|---|---|---|
| D01 | Specific Performance of Contract | (A) |
| D02 | Reach and Apply | (F) |
| D06 | Contribution or Indemnification | (F) |
| D07 | Imposition of a Trust | (A) |
| D08 | Minority Stockholder's Suit | (A) |
| D10 | Accounting | (A) |
| D12 | Dissolution of Partnership | (F) |
| D13 | Declaratory Judgment G.L. c. 231A | (A) |
| D99 | Other (Specify) | (F) |

### MISCELLANEOUS

| Code | Description | Track |
|---|---|---|
| E02 | Appeal from Administrative Agency G.L. c. 30A | (X) |
| E03 | Claims against Commonwealth or Municipality | (A) |
| E05 | Confirmation of Arbitration Awards | (X) |
| E07 | G.L. c.112, s.12S (Mary Moe) | (X) |
| E08 | Appointment of Receiver | (X) |
| E09 | General Contractor bond, G.L. c. 149, ss. 29, 29a | (A) |
| E11 | Worker-s Compensation | (X) |
| E12 | G.L.c.123A, s.12 (SDP Commitment) | (X) |
| E14 | G.L. c. 123A, s. 9 (SDP Petition) | |
| E15 | Abuse Petition, G. L. c. 209A | (X) |
| E16 | Auto Surcharge Appeal | (X) |
| E17 | Civil Rights Act, G.L. c.12, s. 11H | (A) |
| E18 | Foreign Discovery Proceeding | (X) |
| E19 | Sex Offender Registry G.L. c. 178M, s. 6 | (X) |
| E21 | Protection from Harassment c 258E | (X) |
| E25 | Plural Registry (Asbestos cases) | |
| E94 | Forfeiture G.L. c.265 s.56 | (X) |
| E95 | \*\*Forfeiture G.L. c. 94C, s. 47 | (F) |
| E96 | Prisoner Cases | (F) |
| E97 | Prisoner Habeas Corpus | (X) |
| E99 | Other (Specify) | (X) |

**\*Claims against the Commonwealth or a municipality are type E03, Average Track, cases.**
**\*\*Claims filed by the Commonwealth pursuant to G L c 94C, s 47 Forfeiture cases are type E95, Fast track.**

TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | [ X ] Yes        [  ] |

### SUPERIOR COURT RULE 29

**DUTY OF THE PLAINTIFF.** The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, **where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5)(C).**

**DUTY OF THE DEFENDANT.** Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

**A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.**

**FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
MAY RESULT IN DISMISSAL OF THIS ACTION.**

**Attachment To Civil Action Cover Sheet**

**Brandon-COPsync, LLC v. COPsync, Inc. et al.**

### STATEMENT OF DAMAGES

Plaintiff Brandon-COPsync, LLC ("BACS") brings claims against COPsync, Inc. ("COPsync"), Ronald A. Woessner, Russell D. Chaney, and J. Shane Rapp ("Defendants") for breach of contract (against COPsync); breach of the covenant of good faith and fair dealing (against COPsync); promissory estoppel (against COPsync); intentional misrepresentation (against all Defendants); negligent misrepresentation (against all Defendants); interference with advantageous business relations (against COPsync); and violation of 93A (against all Defendants). These claims arise from COPsync's breach of its contract with BACS, its purported termination of BACS's exclusivity rights under the contract, its tortious interference with COPsync's customers and potential customers, and various misrepresentations by Copsync and the other named Defendants.

In accordance with Superior Court Rule 29, BACS states that it is seeking the following damages:

1. Not less than $500,000 pursuant to BACS's contract-based claims;

2. Not less than $4,000,000 pursuant to BACS's tort-based claims; and

3. Not less than $4,000,000 pursuant to BACS's statutory-based claim, subject to doubling or trebling.[1]

2739920

---

[1] To the extent any of these damages are deemed duplicative, BACS will be entitled to collect only one set of non-duplicative damages.

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS

SUPERIOR COURT
C.A. No. 2015-0212D

Brandon-COPsync, LLC

     Plaintiff,

v.

COPsync, Inc., Ronald A. Woessner, Russell
D. Chaney, and J. Shane Rapp

     Defendants.

## PROOF OF SERVICE AFFIDAVIT OF JOSEPH T. TOOMEY, ESQ.

I, Joseph T. Toomey, state the following, pursuant to Mass. R. Civ. P. 4(f):

1.    I am an Associate at Nutter, McClennen & Fish LLP ("Nutter"). Nutter represents Plaintiff Brandon-COPsync, LLC ("BACS") in this matter.

2.    In accordance with Mass. R. Civ. P. 4(e)(3), on May 13, 2015, I mailed, via Certified Mail, Return Receipt Requested, a Summons and a copy of the Complaint filed in this matter to each of the four named Defendants at the following addresses (the "May 13 Mailing"):

Russell D. Chaney
Registered Agent
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

J. Shane Rapp
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

Russell D. Chaney
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

Ronald A. Woessner
COPsync, Inc.
16415 Addison Rd., Suite 300
Addison, TX  75001-3210

3.      The May 13 Mailing also included BACS's Response to Order for Entry of Judgment of Dismissal Nisi and Request for Hearing and this Court's Notice to Appear for Trial regarding same.

4.      Attached as Exhibit 1 is a true and correct copy of the Return Receipt indicating Defendant Ronald A. Woessner's receipt of the May 13 Mailing.

5.      As of the date of this affidavit, I have not received Return Receipts for Defendants COPsync, Inc. ("COPsync"), Russell D. Chaney, or J. Shane Rapp.

6.      Attached as Exhibit 2 is the cover letter I sent to COPsync as part of the May 13 Mailing, addressed to Russell D. Chaney, as Registered Agent of COPsync, at 2010 FM2673, Canyon Lake, TX 78133.

7.      Attached as Exhibit 3 is a true and correct copy of the results of a business organizations inquiry I performed on May 13, 2015 through the Texas Secretary of State's website. Exhibit 3 indicates that Russell D. Chaney is the Registered Agent for COPsync and that COPsync's address is 2010 FM2673, Canyon Lake, TX 78133.

8.      Upon information and belief, Defendant J. Shane Rapp's business address is also 2010 FM2673, Canyon Lake, TX 78133. Copsync, Inc's website, http://www.copsync.com, which I visited on May 13, 2015 and last visited on June 3, 2015, indicates that J. Shane Rapp is located in Comal County, Texas, the county in which Canyon Lake is located.

9.      Attached as Exhibits 4 and 5 are the May 13, 2015 cover letters I sent to Russell D. Chaney, in his individual capacity, and J. Shane Rapp, with each letter addressed to 2010 FM2673, Canyon Lake, TX 78133.

10.     I shall file a supplemental Proof of Service Affidavit when I receive Return Receipts from COPsync, Russell D. Chaney, and J. Shane Rapp.

2

Signed under the penalties of perjury this 3rd day of June, 2015.

Joseph T. Toomey

2803337.2

3

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the following by first-class mail on June 4, 2015. No attorney has yet to file an appearance in the case and it is unclear if Attorney McNamara represents only defendant COPsync, Inc. or all defendants.

Lawrence J. McNamara, Esq.
FordHarrison LLP
1601 Elm Street, Suite 4450
Dallas, Texas 75201
Counsel for COPsync, Inc.

Ronald A. Woessner
COPsync, Inc.
16415 Addison Rd., Suite 300
Addison, TX 75001-3210

J. Shane Rapp
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

Russell D. Chaney
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

Cynthia M. Guizzetti

2815874.1

# Exhibit 1

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

Ronald A. Woessner
COPsync, Inc.
16415 Addison Rd., Suite 300
Addison, TX 75001-3210

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____ ☐ Agent
                  ☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery
Maria G. Fernandez   5-19-15

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☑ Certified Mail®    ☐ Priority Mail Express™
☐ Registered         ☑ Return Receipt for Merchandise
☐ Insured Mail       ☐ Collect on Delivery

4. Restricted Delivery? *(Extra Fee)*           ☐ Yes

2. Article Number
   *(Transfer from service label)*    7014 0150 0000 3404 5448

PS Form 3811, July 2013          Domestic Return Receipt

# Exhibit 2

 **Nutter**

Joseph T. Toomey
Direct Line: (617) 439-2980
Fax: (617) 310-9980
E-mail: jtoomey@nutter.com

May 13, 2015

**By Certified Mail/Return Receipt Requested**

Russell D. Chaney
Registered Agent
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

      Re:    *Brandon-COPsync, LLC v. COPsync, Inc. et al.*,
              <u>Civil Action No. 2015-212-D</u>

Dear Mr. Chaney:

    Pursuant to Rule 4(e)(3) of the Massachusetts Rules of Civil Procedure, enclosed is a Summons to COPsync, Inc. and a copy of the Complaint in the above-captioned action. Also enclosed for service are BACS's Response to Order for Entry of Judgment of Dismissal Nisi and Request for Hearing and Notice to Appear for Trial regarding same.

                                   Very truly yours,

                                   Joseph T. Toomey

cc:    Lawrence J. McNamara, Esq.

Enclosure

2767928.1

NUTTER McCLENNEN & FISH LLP • ATTORNEYS AT LAW

Seaport West • 155 Seaport Boulevard • Boston, Massachusetts 02210-2604 • 617-439-2000 • Fax: 617-310-9000
www.nutter.com

# Exhibit 3

# TEXAS SECRETARY of STATE
# CARLOS H. CASCOS

<u>UCC</u> | <u>Business Organizations</u> | <u>Trademarks</u> | <u>Notary</u> | <u>Account</u> | <u>Help/Fees</u> | <u>Briefcase</u> | <u>Logout</u>

## BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 801011581 | **Entity Type:** | Foreign For-Profit Corporation |
| **Original Date of Filing:** | August 1, 2008 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 12626708627 | **FEIN:** | 262670862 |

| | |
|---|---|
| **Name:** | CopSync, Inc. |
| **Address:** | 2010 FM 2673 |
| | Canyon Lake, TX 78133 USA |
| **Fictitious Name:** | N/A |
| **Jurisdiction:** | DE, USA |
| **Foreign Formation Date:** | October 23, 2006 |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES |
|---|---|---|---|---|---|

| Name | Address | Inactive Date |
|---|---|---|
| Russell Chaney | 2010 FM 2673 Canyon Lake, TX 78133 USA | |

[Order]    [Return to Search]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

# **Exhibit 4**

 **Nutter**

Joseph T. Toomey
Direct Line: (617) 439-2980
Fax: (617) 310-9980
E-mail: jtoomey@nutter.com

May 13, 2015

**By Certified Mail/Return Receipt Requested**

Russell D. Chaney
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

      Re:    *Brandon-COPsync, LLC v. COPsync, Inc. et al.,*
              Civil Action No. 2015-212-D

Dear Mr. Chaney:

     Pursuant to Rule 4(e)(3) of the Massachusetts Rules of Civil Procedure, enclosed is a Summons to you and a copy of the Complaint in the above-captioned action. Also enclosed for service are BACS's Response to Order for Entry of Judgment of Dismissal Nisi and Request for Hearing and Notice to Appear for Trial regarding same.

                  Very truly yours,

                  Joseph T. Toomey

cc:    Lawrence J. McNamara, Esq.

Enclosure

2767929.1

NUTTER McCLENNEN & FISH LLP ⋆ ATTORNEYS AT LAW

Seaport West ⋆ 155 Seaport Boulevard ⋆ Boston, Massachusetts 02210-2604 ⋆ 617-439-2000 ⋆ Fax: 617-310-9000
www.nutter.com

# Exhibit 5

 **Nutter**

Joseph T. Toomey
Direct Line: (617) 439-2980
Fax: (617) 310-9980
E-mail: jtoomey@nutter.com

May 13, 2015

**By Certified Mail/Return Receipt Requested**

J. Shane Rapp
COPsync, Inc.
2010 FM2673
Canyon Lake, TX 78133

> Re:    *Brandon-COPsync, LLC v. COPsync, Inc. et al.,*
>        Civil Action No. 2015-212-D

Dear Mr. Rapp:

Pursuant to Rule 4(e)(3) of the Massachusetts Rules of Civil Procedure, enclosed is a Summons to you and a copy of the Complaint in the above-captioned action. Also enclosed for service are BACS's Response to Order for Entry of Judgment of Dismissal Nisi and Request for Hearing and Notice to Appear for Trial regarding same.

Very truly yours,

Joseph T. Toomey

cc:    Lawrence J. McNamara, Esq.

Enclosure

2767934.1

NUTTER McCLENNEN & FISH LLP ◦ ATTORNEYS AT LAW

Seaport West ◦ 155 Seaport Boulevard ◦ Boston, Massachusetts 02210-2604 ◦ 617-439-2000 ◦ Fax: 617-310-9000
www.nutter.com